### Michelle GANZY, Plaintiff,

v.

### ALLEN CHRISTIAN SCHOOL, and Elaine Flake, Defendants.

### No. 96–CV–5254.

United States District Court, E.D. New York.

March 2, 1998.

---

Hans & Cerniglia, P.C. by Stephen D. Hans, Timothy M. Smith, Rego Park, NY, for Plaintiff.

Henry S. Halprin by Henry S. Halprin, New York, NY, Law Offices of Michael E. Pressman by Michael E. Pressman, Joseph L. Ruscito, New York, NY, for Defendants.

*Amended Memorandum and Order*
WEINSTEIN, Senior District Judge.

*Table of Contents*

I. Introduction ................................................... 344

II. Facts ......................................................... 344

III. Procedural History ............................................ 345

IV. Law ............................................................ 345
 A. Summary Judgment Standard ................................... 345
 B. Sex Discrimination Under Title VII of the Civil Rights Act of 1964 ........... 346
 1. Statute .................................................. 346
 2. Title VII Burden Shifting .................................. 346
 a. Prima Facie Case ..................................... 346
 b. Non-discriminatory Reason ............................ 346
 c. Pretext .............................................. 349
 C. New York Executive Law ..................................... 350
 D. New York Civil Rights Law .................................. 350
 E. Historical Background ....................................... 350
 1. Sexuality of Women ...................................... 350
 2. Women in the Workforce .................................. 354
 3. Today's Women in the United States: Sexuality and Workforce Participation .............................................. 358
 F. Public Policy Accommodating Different Views of Fornication ............... 359

V. Application of Law to Facts in Light of Jury System ........................ 359
 A. Ambiguity of Evidence ...................................... 359
 B. Jury as the Constitutional Institution for Resolving Ambiguity .............. 360

VI. Conclusion ...................................................... 361

## I. Introduction

An unmarried pregnant teacher in a church-affiliated school was fired. She sues the school, raising—apparently for the first time in this guise in this Circuit—difficult issues of conflicts between the rights to sexual freedom and against gender discrimination on the one hand, and to religious freedom to adopt and enforce different moral standards from those of the secular community on the other.

The First Amendment affords religious organizations and their members the right to practice in accordance with their beliefs, establish schools offering parents the opportunity to educate their children pursuant to their religious tenets by hiring those who hold the same religious views, and act in accordance with their own religious-ethical values. Nevertheless, limitations on sexual activity cannot be enforced unequally on male and female employees as a means of gender discrimination.

Fornication is not a crime in New York, and firing a public school teacher simply on this ground would not be justified. *See In re Johnson,* 292 F.Supp. 381, 384 (E.D.N.Y. 1968) (distinguishing between adultery and fornication; the latter has not been proscribed by New York criminal law); *Edwards v. Roe,* 68 Misc.2d 278, 279, 327 N.Y.S.2d 307, 308 (N.Y.City Civ.Ct.1971) (the "law of New York does not proscribe normal sexual intercourse carried out between unmarried consenting adults"). By contrast, a religious school, if its religious principles so dictate, can discharge a teacher merely because he or she engages in coition outside of marriage. (The rights of a private secular school are not now at issue.)

Women can become pregnant. Men cannot. It is therefore sometimes easier to enforce restrictions on sexual activity against a woman employee. Nevertheless, if a woman is dismissed from a teaching position in a religious school because she is pregnant, rather than because she had sexual relations, state and federal prohibitions on gender discrimination are violated.

As demonstrated below, the history and wide variations in public attitudes toward chastity and employment of women outside the home may give rise to varying inferences on whether pregnancy rather than premarital sexual intercourse is the cause for a particular dismissal. The jury, reflective of the differences in conclusions which can be drawn by people of varying backgrounds from the same evidence, provides the appropriate constitutional vehicle for sensibly evaluating the proof in the instant case. The claims of the Plaintiff of illegal discrimination under state and federal law must be tried by a jury.

## II. Facts

In the fall of 1995, Plaintiff Michelle Ganzy was hired by the Defendant Allen Christian School (the "School") as an elementary school mathematics teacher. Ganzy received her B.A. from Hunter College. She is certified to teach in New York state. Her teaching abilities were never challenged.

When Ganzy joined the School, she indicated that she agreed with its "Statement of Belief" on the "Teacher's Application," which, in part, declared that "We firmly believe that the Holy Scripture contains all things necessary for salvation, and is the supreme authority by which our lives are governed." She also agreed, on the "Religious Statement" portion of the application, that her "temperament and lifestyle are in accordance with the will of God and The Holy Scripture," and she stated that "daily I grow more gracefully and spiritually mature." In response to the question "Do you feel that you have been called by God to a TEACHING MINISTRY?," the Plaintiff replied "Yes. My first year of college at Bethune–Cookman College I attended a teacher's seminar where I became inspired by the testimony of others."

The School "puts a major emphasis on religious teaching and education." It "expect[s] ... teachers to be role models for their students." According to the Defendant, "the Christian Principles advocated by the school includes an abolition [sic] against sexual relations outside of wedlock...."

The School is promoted as providing a "Christ-centered education," fostering the "pursuit of spiritual values." In its brochure for parents, the School states that it presents all of its curriculum "in the light of the Word

of God." "[T]eachers provide Bible instruction in varied forms on a daily basis, seeking to establish the Word of God as the foundation of the student's way of life." Students participate in prayer, worship, and religious education. Each grade level offers a structured curriculum in spiritual and biblical principles. Parents applying for admission of their children must affirm that they agree to have them trained in accordance with the doctrinal creed outlined in the "Statement of Belief."

In early 1996, the School learned that Ganzy, then unmarried, was pregnant. Because, according to the Defendant, sexual activity outside of wedlock violated the religious views of the School, and because Ganzy's pregnancy was clear evidence that she had engaged in coitus while unmarried, Defendant Reverend Elaine Flake, co-founder and Educational Director of the School, discharged Ganzy from her teaching position. Flake offered Ganzy assistance in finding a non-teaching position with an affiliated corporation of the School for the duration of her pregnancy, with reinstatement as a teacher after giving birth. Ganzy did not accept the non-teaching position, nor did she contact the School to re-obtain her teaching position after giving birth.

The Plaintiff was, according to her submission, never informed prior to her pregnancy of any policy against her having sex outside of marriage. While chastity before marriage was not referred to at the time of hiring, it is implied, defendant urges, on theological grounds.

The Plaintiff contends that she was told, "I was terminated due to the fact I was pregnant and unmarried and therefore a bad role model." Defendant denies that pregnancy rather than sexual activity was the basis for dismissal. It contends that it would apply its policy against nonmarital sex to both males and females even though this is apparently the first occasion when this activity was the reason for a dismissal.

That it was the pregnancy that caused the transfer or dismissal arguably might be inferred from the affirmation of counsel for the Defendant that Plaintiff was re-assigned "in order that Plaintiff *not set a bad example to students*," who "are taught that abstinence is the acceptable course of conduct with respect to sexual activity outside of wedlock." (emphasis added). Ganzy's swelling body had already been observed by her students; as one defense affidavit states: "We learned of her pregnancy from students at the School, one of whom told us there was a sketch/picture of a 'fat lady' in the Boys Bathroom, with her name under the sketch . . . ."

## III. Procedural History

Plaintiff alleges that her termination as a teacher is employment discrimination based on gender, in violation of Title VII of the Civil Rights Act of 1964, Section 296 of New York's Executive Law, and Section 40–c of New York's Civil Right's Law. A Right to Sue letter was issued by the Equal Employment Commission. Plaintiff and the School have moved for summary judgment. These motions are now denied.

The Plaintiff had named Reverend Elaine Flake as a co-defendant in all of her state and federal claims. Flake independently moved for summary judgment under Title VII and the relevant state law, asserting that she could not be held individually liable for actions taken on behalf of her employer, the Allen Christian School. In the Second Circuit, Title VII liability does not extend to individual employees with supervisory control over the complaining employee. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313–16 (2d Cir.1995). Accordingly, the Title VII claims against Defendant Elaine Flake were dismissed. As the court in *Tomka* noted, however, supervising employees can be held liable under New York law in some circumstances. Jurisdiction to adjudicate the state causes of action against her continues, and these claims were not dismissed. *See* 28 U.S.C. § 1367.

## IV. Law

### A. Summary Judgment Standard

Summary judgment is granted if there are no genuine issues of material fact needing resolution at trial, and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). The party opposing the summary judgment motion must produce evidence showing that there is a genuine factual trial issue. *See National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir. 1989). Conclusory allegations, speculation, or conjecture are not enough. *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990). In deciding whether there is a triable factual issue, ambiguities and reasonable inferences will be resolved in favor of the party opposing the motion. *See Liscio v. Warren*, 901 F.2d 274, 276 (2nd Cir.1990).

There has been adequate time for discovery. Plaintiff has been given an opportunity to amend her complaint. Further delay in deciding the motions is not desirable.

**B. Sex Discrimination Under Title VII of the Civil Rights Act of 1964**

**1. Statute**

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sex or religion. 42 U.S.C. §§ 2000e et seq. The relevant portion of section 2000e–2(a) states that:

[i]t shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's religion, [or] sex. . . .

■ Pregnancy was explicitly brought within the scope of the phrase "because of sex" by a 1978 amendment to Title VII. 42 U.S.C. § 2000e(k). The Pregnancy Discrimination Act prohibits employers from discriminating against women "on the basis of pregnancy, childbirth, or related medical condition." 42 U.S.C. § 2000e(k). A claim of pregnancy discrimination must be analyzed in the same manner as any other Title VII sex discrimination claim. *See Boyd v. Harding Academy of Memphis*, 88 F.3d 410, 413 (6th Cir.1996); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995); *EEOC v. Ackerman, Hood & McQueen, Inc.*, 956 F.2d 944, 947 (10th Cir.1992), *cert. denied*, 506 U.S. 817, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992).

**2. Title VII Burden Shifting**

■ The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden shifting rule is an "allocation of the burden of production and an order for the presentation of proof in Title VII" cases. *St. Mary's Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). It provides a three-part analysis: 1) plaintiff must allege a prima facie case of discrimination, 2) defendant then has the burden of producing evidence that there was a legitimate, non-discriminatory reason for the complained of action, and 3) in response, plaintiff must meet her burden of demonstrating that the proffered legitimate reason is merely a pretext. *See Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc).

**a. Prima Facie Case**

■ The plaintiff's initial burden in establishing a prima facie case is de minimus. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 65 (2d Cir.1995). The complainant must show she (1) is part of a protected group, (2) was qualified for the position and was satisfactorily performing her job, (3) was adversely affected by the decision to terminate her, and (4) was treated less favorably than another nonpregnant employee under similar conditions. *See, e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (gender discrimination); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (racial discrimination); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 311–12 (2d Cir.1997) (national origin discrimination); *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc) (gender discrimination). Establishing a prima facie case supports an inference that the employer unlawfully discriminated against the employee. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**b. Non-discriminatory Reason**

■ The employer must then articulate a legitimate, nondiscriminatory reason for the employee's termination. *See McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A religiously based motive for an employee's termination would normally be unacceptable in a secular setting because it violates Title VII's prohibitions against employment decisions based on religion. Nevertheless, *religious entities* are permitted to base their hiring and termination decisions on religious beliefs under the protection of the free exercise clause of the First Amendment of the United States Constitution; enforcement of such religious beliefs is a legitimate basis for employment decisions by a religious entity. *See Rev. Anne Scharon v. St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360 (8th Cir.1991).

 Sectarian education is constitutionally protected. *See Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). As Justice Powell noted, "[p]arochial schools, quite apart from their sectarian purpose, have provided an educational alternative for millions of young Americans...." *Wolman v. Walter,* 433 U.S. 229, 262, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (Powell, J., concurring in part, and dissenting in part). *Accord Mueller v. Allen,* 463 U.S. 388, 401–02, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983).

Much of our education system has historically been religiously affiliated. *See generally* Diane Ravitch, *The Great School Wars: New York City, 1805–1973, A History of the Public Schools As Battlefield of Social Change* (1973) (The rest of this historical discussion is largely based on the Ravitch volume.). In the 1600's, for example, there were no public schools. The wealthy were educated by private tutors or in private pay schools, schooling for the middle class was primarily in private pay schools, and the poor were either educated in charity schools maintained by their churches or were not educated at all.

In the late 1700's, there were a few attempts at filling the non-religious schooling void for those of little financial resources. The Manumission Society established a non-religious free school in 1787 to educate black children, and in 1794, the growing school was incorporated as the "African Free School." In 1801, a free school for poor white girls was founded by the "Female Association," a Quaker women's organization.

Religious heterogeneity partially explained the void in public schooling in the 17th to early 19th centuries. Since education was traditionally associated with religion, where there was great religious diversity, there was no impetus to establish communal schools. For example, in New York City, the many differing, mostly Protestant, churches had no reason to join together to create one charity school. By contrast, in the New England states, the strong, homogenous religious organization of the Calvinists and Puritans, coupled with their passion for universal education as an article of faith, led to the establishment of mandatory public education as early as the mid–17th century.

In New York City, where religious variations discouraged a unified call for community supported education, and the state and city seemed to believe that the cost of establishing a public school network would be prohibitive, state monies were first disbursed to some church schools which opened their doors to the poor of different denominations. Later, in the early 1800's, the Free School Society provided for "the education of such poor children as do not belong to, or are not provided for, by any religious society." Because the school was not exclusively affiliated with any specific religion, it was able to aggressively petition for public funds and become the unofficial public school in New York City. Notwithstanding its self-characterization and general acceptance as "the public school," its teachings were not divorced from religion. Rather, each school day included Bible reading and a religious lesson.

With the population increase of the early 19th century came intense conflicts among rapidly expanding religious groups for tax money. In 1820, the Bethel Baptist Church obtained public funds from New York for its schools, a development protested vehemently by the Free School Society. In 1840, the Roman Catholic Church directly challenged the state's funding of the Free School Society, declaring that the Free School Society used citizen's tax dollars to impermissibly propagate anti-Catholic dogma under the guise of providing universal public education.

Ultimately, it was agreed that a true public school system was the only solution for the inadequate education of New York's youth. In 1842, a non-religiously affiliated school system, complete with publicly elected trustees, investigators, and commissioners, was approved by the state legislatures. At the same time, the institutionalized religious secular education systems remained strong.

While the debate on public funding of sectarian schools still continues, *see* Jeff Archer, *Potential Binds Complicate Voucher Debate,* Education Week, Oct. 22, 1997, at 1, the right of parents to choose a religious education for their children has remained absolute. The "fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only." *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

■■■ To preserve the religious integrity of sectarian schools, they are allowed to restrict hiring to those who hold beliefs conforming to the school's and to fire those who do not act in compliance with those beliefs. *See Boyd v. Harding Academy of Memphis,* 88 F.3d 410, 413 (6th Cir.1996); *Little v. Wuerl,* 929 F.2d 944, 947–48 (3rd Cir.1991). Inquiry by the courts into the religious faith required by a religious organization of its employees is constitutionally barred. *See Little v. Wuerl,* 929 F.2d 944, 947 (3rd Cir. 1991). Title VII explicitly provides exceptions for religious entities by allowing them to hire only employees of a given religion. It permits employment of teachers based on religion if a school is controlled by a particular religion and a qualification for employment is a religious requirement:

(e) Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, . . . on the basis of his religion [or] sex . . . in those certain instances *where religion* [or] sex . . . *is a bona fide occupational qualification* reasonably necessary to the normal operation of that particular business or enterprise, and (2) *it shall not be an unlawful employment practice for a school,* college, university, or other educational institution or institution of learning *to hire and employ employees of a particular religion if such school, . . . is,* in whole or in substantial part, owned, supported, *controlled,* or managed *by a particular religion* or by a particular religious corporation, association, or society, *or if the curriculum of such school, . . . is directed toward the propagation of a particular religion.*

42 U.S.C. § 2000e–2(e) (emphasis added).

The religious exemption is emphasized in section 2000e–1(a), providing that:

(a) *This subchapter shall not apply to . . . a religious* corporation, association, *educational institution,* or society *with respect to the employment of individuals of a particular religion* to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

(emphasis added).

■■■ These exceptions to Title VII do not sanction gender discrimination, except where, for example, only men can be priests, as required for certain religious functions. *See Dolter v. Wahlert High Sch.,* 483 F.Supp. 266, 271 (N.D.Iowa 1980) (citing 1964 U.S.Code Cong. and Admin. News, p. 2355; and 1972 U.S.Code Cong. and Admin. News, p. 2137) (lay teacher in sectarian school cannot be discharged based on gender but can be discharged based on failure to follow moral precepts, equally applied to males and females); *Boyd v. Harding Academy of Memphis,* 88 F.3d 410, 413 (6th Cir.1996) (preschool teacher can be discharged from religious school for failing to follow moral doctrines, provided the moral doctrines are applied equally to males and females). Without violating the First Amendment, Title VII applies to sectarian schools in cases of gender discrimination. *See Whitney v. Greater N.Y. Corp. of Seventh–Day Adventists,* 401 F.Supp. 1363, 1367–68 (S.D.N.Y.1975). Religious codes of morality must be applied equally to male and female teachers. *See, e.g., Dolter v. Wahlert High Sch.,* 483 F.Supp. 266, 270 (N.D.Iowa 1980).

■■■ In a case of alleged gender discrimination, if a religious organization offers a

legitimate religious reason for an employee's termination, applied equally to both sexes, the court cannot examine the rationality of the proffered belief. *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170 (2nd Cir. 1993) (court cannot inquire into whether the employer's stated reason for terminating a math teacher from religious school for failure to fulfill spiritual mission of the school is unwise or unreasonable). So long as religious requirements are applied equally to both males and females, the court will not evaluate the underlying dogma. *Id.* at 170–71 ("Supreme Court precedents preclude the government from serving as the arbiter of the truthfulness or validity of religious beliefs.").

 Restrictions on pregnancy are not permitted because they are gender discriminatory by definition. *See Dolter v. Wahlert High Sch.*, 483 F.Supp. 266, 270 (N.D.Iowa 1980). By contrast, restrictions on sexual activity, applied equally to males and females, are not discriminatory. *See Boyd v. Harding Academy of Memphis*, 88 F.3d 410, 414 (6th Cir.1996); *Dolter v. Wahlert High Sch.*, 483 F.Supp. 266, 270 (N.D.Iowa 1980). As then Chief Judge McManus summarized the matter in a case much like the instant one:

"The court has no quarrel with defendant's contention that as a lay English teacher [plaintiff] may nonetheless have been intricately involved with the religious pedagogical ministry of the Catholic Church. Nor does the court quarrel with defendant's contention that it can define moral precepts and prescribe a code of moral conduct that its teachers, including [plaintiff], must follow. In deciding plaintiff's claim, the court need not even concern itself in any way with the content of that code nor with the substance of Catholic teaching generally. Certainly the court need not pass judgment on the substance of the Catholic Church's moral or doctrinal precepts. The only issues the court need decide are whether those moral precepts, to the extent they constitute essential conditions for the continued employment, are applied equally to defendant's male and female teachers; and whether [plaintiff] was in fact discharged only because she was pregnant rather than because she ob-

viously had pre-marital sexual intercourse in violation of defendant's moral code."

*Dolter v. Wahlert High Sch.*, 483 F.Supp. 266, 270 (N.D.Iowa 1980) (footnotes omitted).

### c. Pretext

 If the employer provides a legitimate, nondiscriminatory reason for its treatment of the complaining party, it discharges its burden of proof at the initial stage and meets the complainant's prima facie case of discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Fisher v. Vassar College*, 114 F.3d 1332, 1336–37 (2d Cir.1997) (en banc). It is said that the plaintiff then carries the burden of proving that the reason given was a pretext for discrimination, *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), although it is probably less confusing to merely say that the plaintiff must then prove a discriminatory dismissal. To avoid summary judgment, the employee must point to evidence that the questionable discharge was motivated by a discriminatory purpose sufficient to persuade a reasonable jury that the proffered reason for the discharge was really a pretext. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Fisher v. Vassar College*, 114 F.3d 1332, 1337–38 (2d Cir.1997) (en banc). For example, relevant to the issue of pretext is misjudgment of an employee's qualifications, *see Dister v. Continental Group*, 859 F.2d 1108, 1116 (2d Cir.1988); data suggesting that a termination was part of a general pattern of discrimination, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); deviation from the employer's normal employment policies, *see Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2nd Cir.1996); non-discriminatory justification stated only after the allegation of discrimination is made, *see DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2nd Cir.1993); or evidence that the employer knew of flouting of the questionable policy by those of the opposite gender but ignored the violations, *see Boyd v. Harding Academy of Memphis*, 88 F.3d 410, 414 (6th Cir.1996).

Evaluation of the religious merits underlying the proffered doctrinal reason is not an acceptable manner of determining pretext because it would violate both the First Amendment and Title VII. *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2nd Cir.1993) ("Supreme Court precedents preclude the government from serving as the arbiter of the truthfulness or validity of religious beliefs."). "A fact-finder will necessarily have to presume that an asserted religious motive is plausible in the sense that it is reasonably or validly held." *Id.* at 171. Yet, it remains fundamental that religious motives may not be a mask for sex discrimination in the workplace.

### C. New York Executive Law

Section 296 of the New York Executive Law ("New York Human Rights Law") in large measure parallels Title VII. It states in pertinent part:

(1) It shall be unlawful discriminatory practice:

(a) For an employer... because of ... creed, ... sex, ... or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual in compensation or in terms, conditions or privileges of employment.

In analyzing sex and pregnancy discrimination claims brought under the New York statute, the Supreme Court has noted that "the elements of a successful employment discrimination claim are virtually identical" under Title VII and section 296 of the New York Executive Law. *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 479, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). *See also Lisa Dumoulin v. Daniel Formica and McDonald's of Ravena/Delmar, Inc.*, 968 F.Supp. 68, 69 (N.D.N.Y.1997); *Murphy v. Cadillac Rubber and Plastics, Inc.*, 946 F.Supp. 1108, 1119 (W.D.N.Y.1996); *Kump v. Xyvision, Inc.*, 733 F.Supp. 554, 559 (E.D.N.Y.1990). Pregnancy and sex discrimination claims under New York's Human Rights Law are scrutinized according to the *McDonnell Douglas* burden-shifting analysis. *See Kump v. Xyvision, Inc.*, 733 F.Supp. 554, 559–60 (E.D.N.Y.1990).

### D. New York Civil Rights Law

Section 40–c of the New York Civil Rights Law provides that:

(2) No person shall, because of ... creed ... sex, [or] marital status..., as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.

A valid cause of action based on a violation of section 296 of the New York Executive Law exposes the defendant to civil penalties under Section 40–c of the New York Civil Rights Law, recoverable by the person aggrieved. Civil Rights Law §§ 40–c, 40–d; New York Executive Law § 291(1); *see Hart v. Sullivan*, 84 A.D.2d 865, 866, 445 N.Y.S.2d 40, 41 (N.Y.App.Div.1981). Facts sufficient to sustain a cause of action under New York Executive Law section 296 will support a cause of action under section 40–c of the Civil Rights Law. *See People v. Hamilton*, 125 A.D.2d 1000, 1001, 511 N.Y.S.2d 190 (N.Y.App.Div.1986); *Samper v. Univ. of Rochester*, 144 A.D.2d 940, 941, 535 N.Y.S.2d 281 (N.Y.App.Div.1988).

### E. Historical Background

The strong national and state policies against gender discrimination in the workplace cannot ignore a basic distinction in sexual roles—impregnation and child bearing. Nor can it be blind to varying religious and popular views of the status of males and females. A brief, non-comprehensive (and therefore, perhaps, misleading in some particulars) historical analysis is useful in appreciating this interplay and in properly applying the relevant statutes. (Reliance is primarily upon secondary sources, sometimes with only general attribution.)

#### 1. Sexuality of Women

Sexual activity and its boundaries have traditionally been guided by religious directives. *See* Richard A. Posner, *Sex and Reason* 37–69 (1992) (hereinafter *Sex and*

*Reason*). In the 1990's, over 50% of American adults surveyed indicated that their religious beliefs influenced their sexual behavior. *See* Robert T. Michael, John H. Gagnon, Edward O. Laumann, and Gina Kolata, *Sex in America; A Definitive Survey* 234 (1994) (hereinafter *Survey*). Sexual activity norms and mores in America, though influenced by both religious and secular social institutions, generally originated in traditional Judeo–Christian beliefs held by much of the population. *See Women's Rights in the United States, A Documentary History* 1 (Winston E. Langley & Vivian C. Fox eds., 1994) (hereinafter *Women's Rights*).

Christianity became the official religion of the Roman Empire in the fourth century, and its official status was later approved by European governments, ensuring its powerful influence on settlements in America more than a millennium later. Christian ethics on sexuality sanctioned sexual activity only in the form of vaginal coitus in marriage to propagate the human race. *See Sex and Reason* 46.

Premarital and extramarital sexual activity in early America was subject to both social disdain and criminal sanctions. *See, e.g.,* Nathaniel Hawthorne, *The Scarlet Letter* (1850). Partly because women become pregnant, directly evidencing their sexual activity, they have been more frequently subject to such condemnation than men. A single woman who engaged in coital sex outside of marriage was, in a crude phrase, "damaged goods." Grant Dillman, *Girdle, Milkman Becoming Part of Bygone Days*, The Plain Dealer, Jan. 12, 1995, at 5E. A man was not. The difference in the price paid for non-sanctioned copulation by the two sexes remains great in large parts of our society.

Though these traditional restrictions on coition disproportionately restrained women, they did not necessarily foster an inferior status for women. *See Sex and Reason* 47. Rather, Christianity, as an institution, was sometimes theoretically more generous towards women than were pagan religions. *See id.* For example, by encouraging celibacy, the Church freed women from the requirement to marry, and in forbidding divorce, it mandated commitment to a spouse and stigmatized the abandonment of married women. *See id.*

Traditional sexual attitudes were somewhat liberalized in Europe between the 16th and 19th centuries. *See Sex and Reason* 51. Permissiveness was tempered, however, by the increasing prevalence of venereal disease and the policy of corralling sexual activity into married relationships in order to encourage parental responsibility for their offspring.

As America industrialized and shifted from an agrarian economy, the need for large families to work the farms decreased. Industrial and clerical jobs were increasingly available to women. Smaller families and birth control became more common. Contraceptive techniques were developed and their use encouraged by some groups. *See Women's Rights* 134–35.

Increased women's participation in abolitionist and anti-alcohol campaigns and, ultimately, achievement of the right to vote provided a profound intellectual basis for equality. Even more important was the economic effect of the First World War—and then the Second World War and the present need for a female paycheck in the nuclear family—which brought women into the workforce on an ever larger scale. For some women freed from the traditional pattern of continual pregnancy, with decreased reliance for economic sustenance on men and increasing political power, a basis for variations of the modern feminist movement was established. *See Sex and Reason* 54–55.

Some feminists in the first two decades of the 1900's embraced ideological heterodoxy, female sexuality, and eroticism; they were considered "politically left and culturally radical." *See* Steven M. Buechler, *Women's Movements in the United States; Woman Suffrage, Equal Rights, and Beyond* 104 (1990) (hereinafter *Women's Movements*). Under the leadership of Margaret Sanger and with the theoretical work of women such as Emma Goldman, the movement for more information about, and freer access to, birth control gained momentum. *See Women's Movements* 105. New developments in contraception and women's support of birth control were part of a broadening consensus designed to liberate women from their tradi-

tional roles. These developments also provided the opportunity for more sexual indulgence. *See id.* That birth control clinics were still prosecuted as illegal in 1916 suggests the social and ethical turmoil created by such social changes. *See id.* Rejection of Victorian sexual mores, social norms, and dress codes was not universally favored. *See Women's Rights* 223. In the 1920's, more conservative, single-issue organizations such as Margaret Sanger's American Birth Control League evolved, controlled mainly by professionals who shied away from sexual politics. *See Women's Movements* at 110.

Later in the 20th century, feminist politics again recaptured the attention and effort of many women. *See id.* at 106. Though much of the energy of the movement was directed toward obtaining equal employment, educational, and political opportunities, some of its focus was on freeing women from traditional sexual ties. Conventional views on chastity, sexual submission, and repression of a woman's sexual desires were reassessed and rejected by many. At the same time, more reliable contraceptive options gave women the freedom to engage more frequently in sexual activity without automatically undertaking a long-term commitment to children. The move to make abortion legal was gaining popularity, and abortion clinics—though often illegal—were becoming more widespread, allowing women more freedom to engage in sexual activities without fear of unwanted pregnancies. The development culminated legally in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), protecting, within limits, the abortion option.

This freedom generated what has been called a "sexual revolution." Edward O. Laumann, John H. Gagnon, Robert T. Michael, Stuart Michaels, *The Social Organization of Sexuality; Sexual Practices in the United States* 199 (1994) (hereinafter *Organization of Sexuality*). During the 1960's, more women were having sex with more partners than in previous decades, with a lower percentage of women abstaining from premarital sexual activity. *See Organization of Sexuality* 214.

Yet, one of the hallmarks of American society is its heterogeneity. Its religions, its ethics, and its social mores are at varying and inconsistent levels of development and acceptance. A large portion of women—and men—rejected notions of sex outside of marriage, insisting on more traditional views. It is perhaps mainly the freedom to disagree without disenfranchisement and ostracism as protected by the First Amendment that has prevented the United States from flying apart in a centrifugal political and social disaster.

As many women moved toward freedom from sexual restraints that tied them to motherhood or lifelong abstinence, religious groups reacted. *See* Allan C. Carlson, *Family Questions, Reflections on the American Social Crisis* 84 (1988). Some American churches were embraced by feminists and supporters of the women's movement when they offered a religious agenda that was based on current sexual practices, attitudes, and sociological and psychological assumptions. *See id.* Without changing its basic view of procreation, the Catholic Church noted that a "change is also seen both in the manner of considering the person of woman and her place in society, and in the value to be attributed to conjugal love in marriage, and also in the appreciation to be made of the meaning of conjugal acts in relation to that love." Encyclical Letter of His Holiness Pope Paul VI, *Of Human Life, Humanae Vitae* 1 (1968). The Church sanctioned recourse to infecund periods as a method of birth control for married couples. *See id.* at 6–8. Most religious institutions remained strongly opposed to extramarital sex—a view confirmed for many when they considered sexually transmitted diseases, particularly HIV, the growth of teen-age pregnancies, and the economic dependance on the state of single parent, primarily women, families.

It is difficult to obtain reliable data on people's sexual activity. *See Organization of Sexuality* 1–75; *Survey* 9–25. Inaccuracies notwithstanding, a review of the available sexuality statistics through the second half of the 20th century is appropriate.

The mean age of first sexual intercourse for white women born in 1933–1942, 1943–1952, 1953–1962, and 1963–1967 decreased from approximately 18.75 years old, to 18.7 years old, to 17.75 years old to 17.5 years old, respectively. *Survey* 90. Fifty percent of

women born between 1933 and 1942 were married by the age of 20. *Id.* at 97–99. Fifty percent of women born between 1963 and 1974 were married by the age of 25. *Id.* Since, for the relevant time periods, the mean average age of women's first act of sexual intercourse is appreciably less than that of women getting married, a considerable number of women probably had sex prior to marriage.

Data indicates that 90% of women born between 1933 and 1942 married without ever having had sexual intercourse, or having had sexual intercourse only with their future spouse. *Id.* at 97. Of women born 30 years later, between 1963 and 1974, only 36% of them were married without first having had sexual intercourse with their spouse. *Id.* The percentage of women born during the periods of 1933 to 1942, 1943 to 1952, 1953 to 1962, and 1963 to 1974 who had vaginal intercourse before marriage changed from 44.9% to 66.2% to 72.6% to 69.8%, respectively. *Organization of Sexuality* 214. Whether the drop in final percentages is due to a change in mores or to a statistical artifact caused by the fact that some of the women born in 1974 are currently only 24 years old is not clear.

By 1995, researchers estimated that as many as 90% of unmarried women have engaged in premarital sex, often with multiple partners. Grant Dillman, *Girdle, Milkman Becoming Part of Bygone Days,* The Plain Dealer, Jan. 12, 1995, at 5E. 42% of Americans surveyed in 1996 believe that there is nothing wrong with premarital sex. *Americans More Tolerant of Premarital Sex, Gays,* The Phoenix Gazette, Aug. 16, 1996, at A2. *See also, e.g.,* Jennifer Weiner, *Talk of the Teens: It's no secret many kids are becoming sexually active sooner,* The Dallas Morning News, July 25, 1996, at 5C; Hunter College Women's Studies Collective, *Women's Realities, Women's Choices, An Introduction to Women's Studies* 347 (1983).

Yet, one in every four surveyed reported feeling that sex outside of marriage is always wrong. *Americans More Tolerant of Premarital Sex, Gays,* The Phoenix Gazette, Aug. 16, 1996, at A2. A strong countermovement to premarital sex lies at the heart of the legal controversy in the instant case.

"Is it possible to make a liberal, feminist argument for pushing abstinence," asks one commentator, answering, "I believe it is." Ellen Hopkins, *Making Teen Sex Uncool,* San Francisco Chronicle, February 7, 1993, at 2Z1. Recent research reveals a movement toward more sexual restraint and abstinence. *See* Dipankar De Sarkar, *Population: Study Warns of the Risks of Teenage Motherhood,* Inter Press Service, Feb. 14, 1997, *available in* 1997 WL 7073693. An increased fear of the potential consequences of casual sex, such as sexually transmitted diseases, recognition of the economic ramifications of having children before completing an education, a general movement toward increased morality, and opposition to women's attempt to bolster their self-esteem through sexual activity have led to increasing acceptance of sexual restraint. Rather than tying abstinence to traditional notions of sin, some sexual restraint advocates are emphasizing secular reasons for abstinence such as prevention of AIDS, prevention of unwanted pregnancy, preservation of self-respect, exercising will-power by making individual choices in a sexually chaotic society, and empowerment by setting boundaries. *See* Jenny Offill, *How It's Become Hip to Be, Like, a Virgin,* Newsday, May 25, 1997, at GO6.

Teen-age childbearing is now strongly discouraged both for the well-being of the parties involved and for the good of future society. *See* Dipankar De Sarkar, *Population; Study Warns of the Risks of Teenage Motherhood,* Inter Press Service, Feb. 14, 1997, *available in* 1997 WL 7073693. Early parenting is associated with lower academic achievement, less success in the workforce, higher incidents of poverty and drug use, and similar problems in the children. *Id.* Recent studies indicate that some teenagers are reacting by indulging in less sexual activity than in previous years. *See Survey* 94.

The traditional appeal of remaining "virtuous" until marriage has been revitalized. Christopher R. Brauchli, *From the Wool-Sack,* Colorado Lawyer, May 1997, at 45. A virgin marriage, in and of itself, absent any consideration of the health implications, is regaining its historical esteem. *See id.* Similarly, the appeal of cohabitation may be de-

creasing, with only 33% of the population approving of couples living together prior to marriage, in spite of its being widely touted as a method of "trial marriage." Carrie Teegardin, *Opinion on Adultery Remains the Same—it's a no-no, Intelligencer Journal,* Lancaster New Era, Aug. 27, 1996, at A7.

Such trends are not exclusively being driven by distinct religious or political groups. *See* Jenny Offill, *How It's Become Hip to Be, Like, a Virgin,* Newsday, May 25, 1997, at G06. Some contend this development is part of a more complex feminist movement. *See For the People, By the People; Stuff and Nonsense,* Insight Magazine, May 16, 1994, at 35. The ability to abstain from sexual activity, without being automatically accorded the negative status of a "spinster" or one rejected by potential lovers, is viewed by some as a powerful female act of control over her body and destiny. *Id.* at 35; Leonore Tiefer, *"Am I Normal?": The Question of Sex, in Every Woman's Emotional Well–Being* 56 (Carol Tarvis ed., 1986); Carin Rubenstein, *About Love, in Every Woman's Emotional Well–Being* 78 (Carol Tarvis ed., 1986) (half of women and one-third of men stated sex without love was unsatisfying).

The growing esteem of abstinence is apparently somewhat gender-neutral. More twenty-year-old men are virgins now than forty years ago. *Survey* 95. *But cf. id.* at 237–38 (a woman is more likely to look for a significant other or spouse, with promises of a future, whereas men are more likely to look for short term recreational relationships).

### 2. Women in the Workforce

It has been suggested by some that women in early societies were more equal than they have been in modern times. *See* Simone De Beauvoir, *The Second Sex* 66 (H.M. Parshley trans. & ed., Alfred S. Knopf 1953) (1949). Women had extraordinary prestige as producers of the children needed by a society for agricultural pursuits. *See id.* Often the children belonged to their mother's clan, carried the mother's name, and inherited property through the mother. *See id.*

Because propagation of children was critical to the existence of the community, women were often pregnant. Since maternity arguably bound women to a more sedentary existence, the primitive woman remained close to the hearth as a concession to her maternal situation. *See id.* at 72.

Nevertheless, a portion of the female population in America has always been employed outside of the home. Female indentured servants came from Europe as early as the 1620's. *See* Kerry Segrave, *The Sexual Harassment of Women in the Workplace, 1600 to 1993* 12 (1994) (hereinafter *Sexual Harassment of Women* ). Many female slaves worked in the fields. Indentured servants and slaves notwithstanding, few women worked outside of the homestead. Until the early 1800's, they were mainly spouses or domestic servants. *See generally Frisky Business,* Psychology Today, Mar. 1, 1995, at 34.

Through the 1800's, Americans were involved in cultivating the land and developing the new world. *See generally* Simone De Beauvoir, *The Second Sex* 124 (H.M. Parshley trans. & ed., Alfred S. Knopf 1953) (1949). The majority of Americans were farmers. Men and women shared many of the responsibilities involved in cultivating the land; both took active roles on the farm. *See id.* ("At the beginning of the nineteenth century women had to share with men the hard work of pioneering. . . .").

The Industrial Revolution encouraged a new family structure. *See generally Women's Movements* 12–13, 98. A developing capitalism was free and robust during the 1800's as the United States gradually evolved from an agricultural into a manufacturing economy. At first, this change divided the labor of men and women. While the men went to work in the factories and businesses, they relied on wives for unpaid domestic labor and the nurture of the children. The assumption was that a male worker had a wife at home. Yet, the evolving role of women was less and less reflected in this theory, since from early on many labored in the mills and factories of the East, or served as teachers and nurses.

The women's movement in the workforce has a long history in the United States. *See* Jacquelyn H. Slotkin, *You Really Have Come A Long Way: An Analysis and Comparison of Role Conflict Experienced by Women Attorneys Today and Educated Women Twen-*

*ty Years Ago,* 18 Women's Rts. L. Rep. 17, 21 (1996) (hereinafter *A Long Way* ). Before the end of the 19th century, women moved steadily into the workplace. *See Frisky Business,* Psychology Today, Mar. 1, 1995, at 34. By the early 1900's women comprised 20% of paid workers. *See* Deborah L. Markowitz, *In Pursuit of Equality: One Woman's Work to Change the Law,* 14 Women's Rts. L. Rep. 335, 336 n. 14 (1992) (hereinafter *One Woman's Work* ) (citing Ruth Bader Ginsburg, *Sex Equality Under the Fourteenth and Equal Rights Amendment,* 1979 Wash. U.L.Q. 161, 167–8). Nonetheless, they remained disadvantaged by the social boundaries that faced women in education. *See* Jerry A. Jacobs, *Revolving Doors: Sex Segregation and Women's Careers* 44–46 (1989) (hereinafter *Revolving Doors* ).

At the turn of the century, women with bachelor's degrees were considered by some to be "too well educated," since it was not the norm for women to attain higher education. *Id.* at 44. As the emphasis on companionate marriages increased, however, and it became highly desirable for women to be able to relate intellectually to their mates, the social acceptance of an educated woman increased. *See id.* at 45–46. More women began pursuing and attaining higher levels of education for this reason and to develop their own potential. This change produced a serious tension in the female. institutional role. More educated women pursued work outside the home to explore their expanded intellectual interests and utilize their new skills. *See id.* at 46.

Despite their increasing numbers as workers, women's subordinated roles largely remained. Family demands and physiology were ideological justifications for women's secondary status at work. Legal developments during this period reflected and solidified these rationales. In 1908 the United States Supreme Court in *Muller v. Oregon* approved a statute that limited the number of hours women could work. *See Muller v. Oregon,* 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908). The Supreme Court sanctioned this restrictive law, reasoning that "a long time on [a woman's] feet at work, repeating this from day to day, tends to injurious effects upon the body, and, as healthy mothers are essential to vigorous offspring, the physi-

cal well-being of woman becomes an object of public interest and care in order to preserve the strength and vigor of the race." *Id.* at 421. Moreover, the Court noted, "history discloses the fact that woman has always been dependent upon man," and "[h]e established his control at the outset by superior physical strength, . . . and this ·control in various forms, with diminishing intensity, has continued to the present." *Id.* at 421.

Women were excluded from certain occupations and otherwise discriminated against. "[D]espite the vast changes in the social and legal position of women," the Supreme Court in *Goesaert v. Cleary* held that "[s]ince bartending by women may. . . give rise to moral and social problems," the state could prohibit a woman from bartending unless her husband or father owned the tavern. *Goesaert v. Cleary,* 335 U.S. 464, 465–66, 69 S.Ct. 198, 93 L.Ed. 163 (1948) ("The fact that women may now have achieved the virtues that men have long claimed as their prerogatives and now indulge in vices that men have long practiced, does not preclude the States from drawing a sharp line between the sexes. . . ."). Women were often prohibited from keeping their maiden names after they married. *See Whitlow v. Hodges,* 539 F.2d 582 (6th Cir.1976), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 654, 50 L.Ed.2d 632 (1976). They ·could be fired if they became pregnant, and unpaid maternity leaves could be insisted upon by the employer. *See Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). Women could legally be excluded from educational institutions, men-only clubs were common, and restaurants were allowed to ban females. *See, e.g., Bradwell v. Illinois,* 16 Wall. 130; 83 U.S. 130, 21 L.Ed. 442 ·(1872) (exclusion of women from the legal profession). Courts condoned discriminatory treatment, manifesting paternalistic, patriarchal concern for the "ladies" and patronizing articulations of "chivalry." *One Woman's Work* 336 (citing Ruth Bader Ginsburg, *From No Rights, to Half Rights, to Confusing Rights,* 7 Hum. Rts. 12, 13 (1978)). Because, it was argued, "women's physical structure and the performance of maternal functions placed her at a disadvantage in the struggle for subsistence," gender-biased labor legislation was upheld. *Muller v. Ore-*

gon, 208 U.S. 412, 421, 28 S.Ct. 324, 52 L.Ed. 551 (1908). Women were even exempted from jury duty because, "[d]espite the enlightened emancipation of women from the restrictions and protections of bygone years, and their entry into many parts of community life formerly considered to be reserved to men, woman is still regarded as the center of home and family life." *Hoyt v. Florida,* 368 U.S. 57, 61–62, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). These reflections of the views of society regarding the role of women posed a seemingly insurmountable hurdle to the women who felt they needed more scope than society was allowing them.

Because so many men were called away to fight during World War I, and industrial output to supply our forces and those of our allies required full, around-the-clock production, there was an extreme shortage of workers in the United States. Women were called upon to make up for the scarcity. *See, e.g., Sexual Harassment of Women* 140. They were urged to join the crusade, to be patriotic citizens, and to work for their country. *See* Hunter College Women's Studies Collective, *Women's Realities, Women's Choices. An Introduction to Women's Studies* 548 (1983). When the soldiers came home, however, support for women in the workforce faded. *See Women's Rights* 227–28; *see Revolving Doors* 7. While some women stayed in "pink collar" jobs, typing and answering phones, most returned to the home. *Revolving Doors* 7.

During much of the first half of the 20th century, leading up to World War II, the goal of most Americans was not to displace women from their traditional family role, but to strengthen the household and ensure that men could earn a decent wage to support their family. *See id.* at 73. Women were expected to stay home and take care of the housework and children. *But cf.* John Updike, *In the Beauty of the Lilies* 83–84 (1997 paperback ed.) ("A fourth of the more than two thousand persons arrested [in the Patterson silk mills strike of 1913] were women ... and girls;" "women ... emerged as leading spirits of the strike").

World War II and its aftermath brought dramatic social changes and increased opportunity for women, particularly in education and in the labor force. *See A Long Way* 21–22; *Women in Steel—They Are Handling Tough Jobs in Heavy Industry,* Life Magazine, Aug. 9, 1943, at 75. By the 1940's, women over thirty five were entering the labor force in record numbers. *See A Long Way* 21. Better educated, with the right to vote, and with new machines substituting for brawn, many began to realize that females were capable of performing the same jobs as males. Again, however, when the men returned from battle, the women were urged to go back to their homes. Postwar society created the ideal of the suburban nuclear family, with the "proper" woman staying at home. *Cf. id.* 21 (women were trapped in "society's conflicting and contradictory expectations"). The old "ideal," however, did not long withstand the practicalities of a new educational, technological, biological, economic, and sociological tide. *See* Kristin McCue & Manuelita Ureta, *Women in the Workplace: Recent Economic Trends,* 4 Tex. J. Women & L. 125, 126 (1995).

The 1950's, 60's and 70's were characterized by dramatic developments that short circuited the usual relationships between traditional sexual socialization and careers. *See Revolving Doors* 57. In the 60's and 70's, a part of the feminist movement attacked the image of the omnipresent housewife. *Cf. Women's Rights* 231 ("Critics blamed the decline of the social order on the flapper."). It presented a direct challenge to traditional values and insisted upon equal pay to men and women for equal work and equal opportunities for hiring and advancement. *Cf. A Long Way* 21–22.

By the mid 1960's, the first generation of children born after World War II were reaching maturity. Many of these young adults questioned and rejected the traditional patterns of family life, sexual expectations, and gender role stereotypes. *See A Long Way* 17 (citing Group for the Advancement of Psychiatry, The Educated Woman: Prospects and Problems, Rep. 92, 134–39 (Mental Health Materials Center, Inc.1975)). An influential Commission published a report on the status of women, calling for equality in the workplace. *See A Long Way* 17 (citing President's Commission on the Status of Women, American Women: Report of the

President's Commission 2–43 (1963)). Many feminist theorists were providing a rationale for a new role of women. *See, e.g.,* Betty Friedan, *The Feminine Mystique* (Dell Pub. Co.1974) (1963); Simone De Beauvoir, *The Second Sex* 66 (H.M. Parshley trans. & ed., Alfred S. Knopf 1953) (1949). The National Organization for Women was formed in 1966, amplifying the volume of women's voices. *See A Long Way* 18. Informal grass roots women's groups spread widely. Masters and Johnson's Human Sexual Response was released; it expressed what was seen by some as the revolutionary theory that women have at least as great an interest in sex as do men. *See generally* William H. Masters & Virginia E. Johnson, *Human Sexual Response* (1966). Shaping women's consciousness were also dramatic declines in fertility, increases in divorce (by the mid 60's to late 70's, over a third of all American marriages could be expected to end in divorce), improvement of contraceptive techniques, legalization of abortion, and increasing focus on population control as a worldwide concern. *See Women's Rights* 273–77; *see also* Kristin McCue & Manuelita Ureta, *Women in the Workplace: Recent Economic Trends,* 4 Tex. J. Women & L. 125, 126, n. 1 (1995). All of these factors provided strength and momentum to women's pressure for equality in the work-force.

Women's paid labor force participation in 1940 and 1950, respectively, was 30% and 33.9%. *Revolving Doors* 1–2. By 1970, 50% of American women eighteen to sixty were in the paid labor force. U.S. Department of Commerce, Bureau of the Census, 1970 Census of Population, Characteristics of the Population, United States Summary, 718–19, 772–73 (1973). At the same time, increasing numbers of women, especially of the middle class, entered college. *See A Long Way* 21–22. These two trends sustained the modifications in roles, status, and aspirations of American women. *See id.* at 22.

From the social and cultural changes that the nation was experiencing came increased awareness of the injustice of the second class status of working women, leading to significant legal and social reforms, especially in the area of employment. *See One Woman's Work* 336. The federal Equal Pay Act of 1963 prohibited discrimination in pay for sub-stantially similar work. *See* Equal Pay Act of 1963, Pub.L. No. 88–38, 77 Stat. 56 (1963). Title VII of the Civil Rights Act of 1964 broadly prohibited discrimination on the basis of sex in employment. *See* Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. In the late 1960's, the President issued Executive Orders to eliminate sex discrimination against employees of the federal government and federal contractors. *See One Woman's Work* 336. Commissions on the status of women were established in several states, and state governments began to acknowledge and protect women's right to equality in the workplace. *See id.*

In the last 30 years, unprecedented economic growth with corresponding increases in living standards in industrialized countries has generated tremendous demand for additional labor. *See* Virginia Novarra, *Women's Work, Men's Work: The Ambivalence of Equality* 90–91 (1980). The labor shortage has been met in the United States in large part by the entry of more women into paid employment outside the home. *See id.* This post-industrial phase, characterized by service jobs, opened a vast new job market for women. *See Women's Movements* 23. *Cf.* Mary Ruggie, *The State and Working Women. A Comparative Study of Britain and Sweden* 3, 30–31 (1984). By 1970, as already noted, 50% of all women between the ages of 18 and 64 were working. *A Long Way* 21–22 (citing Valerie Kincade Oppenheimer, *Demographic Influence on Female Employment and the Status of Women, in Changing Women in a Changing Society* 184–85 (Joan Huber ed., 1973)).

Women gradually began marrying later or not marrying at all, requiring them to have jobs to support themselves and not infrequently their children. From 1970 to 1994, the unmarried sector of the population over age 18 grew from 28% to 39%. Arlene F. Saluter, Marital Status and Living Arrangements: March 1994, Current Population Reports, Population Characteristics, U.S. Department of Commerce, Economics and Statistics Administration, Bureau of the Census vi-vii. For these unmarried women, working was a necessity.

Women with children also began entering the workforce in larger numbers. This development was due partly to new opportunities for women in service jobs, a desire to obtain wealth and status, and, as divorce became more accepted, large numbers of divorced mothers with the need to support themselves and their children. *See* Susan Moller Okin, *Justice, Gender, and the Family* 160–61 (1989). It is accelerated now with "welfare reform." *See, e.g.*, Jason DeParle, *Success, and Frustration, as Welfare Rules Change*, N.Y. Times, Dec. 30, 1997, at 1.

By the 1980's, most American mothers were in the workforce. In 1980 working mothers made up 51.6% of single mothers, and married working mothers totaled 60.8% of married mothers. U.S. Department of Commerce, Bureau of the Census, Statistical Abstract of the United States 1996, The National Data Book, 400 tbl. 626 (116th ed.1996). In 1985, over 70% of women between the ages of 20 and 44 held paying jobs. *Revolving Doors* 1. Nearly half of these women had children under one year old. *Id.* By the late 1980's, over half of mothers with children under the age of three were in the workforce. Deborah L. Rhode, *Gender Equality and Employment Policy in American Women in the 90's—Today's Critical Issues* 260 (Sherri Matteo ed., 1993).

Women in the 1990's have more freedom and options available to them than women in previous decades. In the mid–1990's, over 50% of all college graduates were women. *A Long Way* 18 (citing U.S. Department of Commerce, Bureau of the Census, Statistical Abstract of the United States 1995, The National Data Book, 189 (115th ed.1995)). Only one of every three mothers is a full-time stay-at-home mother. *A Long Way* 18 (citing Peter Cattan, *Childcare Problems: An Obstacle to Work*, Monthly Lab. Rev., Oct. 1991, at 3). At the end of 1996, 94.4% of employable women were employed. U.S. Department of Commerce, Bureau of the Census, Statistical Abstract of the United States 1996, The National Data Book 400, Table 628 (116th ed.1996).

With the passage of time, the role of the working mother has become conventional. Since more mothers are unmarried and since more children are being raised in single parent homes, the working-mother-role is often unavoidable. From 1970 to 1993, the rate of live births to unmarried women almost tripled. Statistical Abstract of the United States 1996, The National Data Book, U.S. Department of Commerce, Bureau of the Census, Table No. 98, p 79, Issued October 1996. (United States census data defines unmarried women as never-married, widowed, or divorced. *See id.*)

In 1970, there were 399,000 live births to unmarried women, comprising 10.7% of all births in that year. *Id.* In 1980, there were 666,000 live births to unmarried women, 18.4% of all births in that year. *Id.* By 1993, the number had grown to 1,240,000, 31.0% of all births in that year. *Id.*

Taken with the data on sexuality already referred to, it is not unsound to conclude that a large proportion of employed unmarried women are engaging in sexual activities. Despite more effective contraceptives, the result has been more children raised by single parents. *See* Steve Rawulings and Arlene F. Saluter, Household and Family Characteristics: March 1994, Current Population Reports, Population Characteristics, U.S. Department of Commerce, Economics and Statistics Administration, Bureau of the Census xvi. In 1994, 31% of all parent-child households had only one parent, whereas in 1970, 13% of the parent-child households had one-parent. *Id.* at xiii. Between 1970 and 1994, the number of children living with a never-married parent jumped from 6% to 35% of all children. Arlene F. Saluter, Marital Status and Living Arrangements: March 1994, Current Population Reports, Population Characteristics, U.S. Department of Commerce, Economics and Statistics Administration, Bureau of the Census x-xi.

3. Today's Women in the United States: Sexuality and Workforce Participation

In 1797, if women who had engaged in sex outside of wedlock were prohibited from working outside of the home, the effects on society, the economy, the stability of the household, and individual women would be minimal because (a) few women were working outside of the household and (b) relatively few women had sexual activity outside of wedlock. In 1997, if all employers refused to

hire women who engaged in sex outside of wedlock, the effects on society, the economy, the economics of the household, and individual women and their children would be devastating because (a) most women work outside of the home and (b) many women are sexually active outside of wedlock.

Morality and legality aside, the practical effects of barring sexually active unmarried women from the workforce in the American modern world would be unacceptably destructive to our society and economy. In both the private and public school systems, the overwhelming majority of teachers are female. *See* Statistical Abstract of the United States, 1996, Tables 236, 253, 268 (Oct. 1996); Report, The State Education Department, New York, The State of Learning, submitted February 1997, Table 4.12. Based upon the statistics on premarital sex, it can be assumed that many female teachers in private and public schools were not chaste before marriage, and some unmarried female teachers engage in sexual intercourse.

### F. Public Policy Accommodating Different Views of Fornication

The court's role in carrying out the law's restrictions on these revolutionary societal developments over the last few years is to enforce legal policy as reflected in the Constitution, statutes, and case law of the federal and state governments. That law has, in the main, adjusted to this new sexual and working world. It protects women against discrimination in the workforce, it generally prevents interference with the privacy of sexual relationships (at least of adults), it recognizes the right of women to bear children out of wedlock and, yet, it acknowledges the right of a large portion of the population to discourage extramarital sex through their religious schools and other institutions.

"In the area of morals, it is state law which ordinarily regulates individual conduct." *In re Johnson*, 292 F.Supp. 381, 384 (E.D.N.Y. 1968). Diversity of views about premarital sex is reflected in the laws of states which still prohibit "fornication," or sexual intercourse between unmarried persons. Ga. Code Ann. § 16–6–18 (1968); Mass. Gen. Laws Ann. ch. 272, § 18 (West 1990); Minn. Stat. Ann. § 609.34 (West 1987); Miss.Code Ann. § 97–29–1 (1972); S.C.Code Ann. § 16–15–60 (Law. Co-op 1976); Va.Code Ann. § 18.2–344 (Michie 1950); W. Va.Code § 61–8–3 (1966); *see, e.g.,* N.C. Gen.Stat. § 14–184 (1993). *But cf., e.g.,* N.J. Stat. Ann § 2A:110–1 repealed by L.1978, c. 95, S 2C:98–2, eff. Sept. 1, 1979 (repeal of fornication law).

Religious institutions, as demonstrated in Section IV B 1 and 2 b, *supra,* are provided leeway under federal constitutional and statutory law in regulating the sexual conduct of those in their employ in keeping with their religious views, under the protection of the First Amendment. Nevertheless, they may not, as the statutes and cases analyzed in Section IV B, C, and D, *supra,* demonstrate, use pregnancy as a surrogate for job discrimination.

### V. Application of Law to Facts in Light of Jury System

#### A. Ambiguity of Evidence

■ Plaintiff successfully met her initial burden of establishing a prima facie case of gender discrimination. *See* Part IV A 2, *supra.* She (1) is part of a protected group, (2) was qualified for the position she held and was satisfactorily performing her job, (3) was adversely affected by the decision to terminate her, and (4) was arguably treated less favorably than nonpregnant employees under similar conditions. *See id.* As a pregnant woman, the Plaintiff had a protected status. There is no indication in the record that she was not qualified or was not satisfactorily performing her job. She clearly was adversely affected by the decision to terminate her. She was arguably treated less favorably than at least some other nonpregnant employees.

This prima facie case supported an inference that the School unlawfully discriminated against Ganzy in terminating her. The School had the burden of proffering a legitimate, nondiscriminatory reason for the termination. *See id.* To discharge the burden, the School stated that Ganzy violated its religious teachings by engaging in premarital sexual activity. As a sectarian private institution, the School has the right to employ

only teachers who adhere to the school's moral code and religious tenets. *See* Part IV B 2 b, *supra.*

Plaintiff's argument that the School is not a religious entity, and therefore cannot be afforded the protection of the First Amendment or the exceptions to Title VII, is without merit, given the School's teachings, curriculum, self-promotion, and name. *See, e.g.,* James Traub, *Floyd Flake's Middle America,* The New York Times Magazine, Oct. 19, 1997, at 60–106. The School is indisputably a religious entity.

The facts and evidence are extremely sparse. The record thus far does not indicate whether anyone else—male or female— has ever been fired as a teacher by the Defendant for sexual intercourse outside of marriage.

Plaintiff's evidence of Defendant's reliance on pregnancy at the time of firing, its embarrassment about pregnancy graffiti on the walls of its boys' bathroom, and its willingness to re-hire the Plaintiff after she gave birth might lead a jury to find that the religious reason—premarital sex—for the termination is a pretext. Contrariwise, a jury might well find that re-employment was offered because the School's religious beliefs advocate allowing a sinner a fresh start, to "go, and sin no more." *John* 8:11 (King James Version). Or it might simply not believe the Plaintiff's version of the incident.

B. Jury as the Constitutional Institution for Resolving Ambiguity

■ Issues of fact are presented. A jury is in at least as good a position as a judge or appellate court to determine whether it was pregnancy or fornication that caused the Defendant to dismiss the Plaintiff. As Justice Black reminded us in *United States v. Quarles,* 350 U.S. 11, 18, 76 S.Ct. 1, 100 L.Ed. 8 (1955): "Juries fairly chosen from different walks of life bring into the jury box a variety of different experiences, feelings, intuitions, and habits."

Even as to adultery—which is widely condemned and is a clear violation of the Decalogue—there is said to be variation in attitude, depending upon the income and reading habits of the adults questioned. *See* Hendrik Hertzberg, *Survey,* The New Yorker, Jan. 5, 1998, at 29 (readers of New Yorker "are far more tolerant of adultery: half say it is acceptable under certain circumstances, while 84 percent of [those with moderate incomes] and 74 percent of those with [high income] say it is always morally wrong"). *But cf.* Carrie Teegardin, *Opinion on Adultery Remains the Same—it's a no-no, Intelligencer Journal,* Lancaster New Era, Aug. 27, 1996, at A7 ("Between 1974 and 1994, the percentage of Americans who said it is 'always wrong' for a married person to have sex with someone other than their husband or wife increased from 73 to 78 percent.").

These differences in societal views does not mean that the heterogeneous jury likely to serve in the Eastern District of New York—covering all of Staten Island, Brooklyn, Queens, Nassau, and Suffolk—would substitute its view of what the law is for that charged by the court. Experience suggests that jurors would follow the law. Nevertheless, in their evaluation of the evidence and conclusions as to the facts, differences in experience and outlook might well make a difference. *Cf. United States v. Shonubi,* 895 F.Supp. 460, 482–83 (E.D.N.Y.1995) (discussing decision-maker's use of inferences based on prior information and training), *vacated on other grounds,* 103 F.3d 1085 (2d Cir. 1997); Mae C. Quinn, *The Garden Path of Boyles v. Kerr and Twyman v. Twyman: An Outrageous Response to Victims of Sexual Misconduct,* 4 Tex. J. Women & L. 247, 264–65 (1995). Even judges frequently differ in the conclusions they draw from the evidence when determining intent in discrimination cases. *See, e.g., Stern v. Trustees of Columbia Univ.,* 131 F.3d 305 (2d Cir.1997) (trial judge and one member of court of appeals panel had no doubt that there was no discrimination, while two appellate judges were dubious and found summary judgment inappropriate on the evidence); *Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997) (en banc) (judges differed in evaluation of evidence of discrimination on the basis of gender).

The complex history of women's rights, employment, and sexuality demonstrated in Part IV E, *supra,* as well as normal methods of determining witnesses' credibility, might lead different jurors to evaluate differently

the veracity of the witnesses and the honesty of the Defendant's proffered reason for dismissal. Under such circumstances, a decision by a cross-section of the community in a jury trial is appropriate. "The jury ... will be entitled to view the evidence as a whole in assessing whether there was impermissible discrimination and whether the ... proffered explanation is a pretext for that discrimination." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir.1997).

## VI. Conclusion

The motion by Plaintiff and the motion by Defendant School for summary judgment are denied.

SO ORDERED.