798 F.2d 1417
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Gelaine WILSON, Plaintiff-Appellant,
v.
ADVANCE MORTGAGE CORPORATION, Defendant-Appellee.
 NO. 84-1525.
 United States Court of Appeals, Sixth Circuit.
 July 18, 1986.
 
 Before JONES and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Gelaine Wilson's action against Advance Mortgage Corporation (AMC) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000(e) et seq. (1982), was dismissed after the presentation of Ms. Wilson's evidence, pursuant to Federal Rule of Civil Procedure Sec. $41(b). We affirm.
 
 
 2
 Gelaine Wilson was hired by AMC in 1973 as a secretary. Wilson, a black woman, was 22 years old and had some college education and previous loan collection experience when she began work at the company's Michigan servicing division. Soon after, in November 1973, she was promoted to Assistant Manager and given the responsibility of collecting a portion of the delinquent loans. It is undisputed that Wilson performed well as Assistant Manager.
 
 
 3
 In April of 1975 Ms. Wilson was promoted to Area Servicing Manager. As such, she was primarily responsible for controlling the delinquency ratio of the Michigan loan portfolio. Wilson received a salary during this time of $13,000 while her white male assistant, William Knell, made $15,000.
 
 
 4
 During this time a nationwide economic recession hit the Michigan area with particular severity. As a consequence, the percentage of delinquent accounts in Ms. Wilson's office rose dramatically. The delinquency rate rose from 6.8% to 9.7% in a single month and eventually reached 10.7%. The Department of Housing and Urban Development (HUD), AMC's major investor, became increasingly concerned and, after an audit of the Michigan office, placed AMC on probation for 180 days and changed the procedures used to handle delinquent loans. The audit and subsequent changes caused a significant reorganization in AMC's operations. Ms. Wilson's supervisors changed her position from Area Servicing Manager to Assistant Manager, which Wilson claimed was a demotion.[1] AMC transferred Richard Waldorf, an Area Manager from another location, to the Michigan office to take over Wilson's duties. AMC stated that it planned to place Wilson back in her old position after six months[2] At the time of demotion, Wilson received a salary of $13,000 as Area Manager, while Waldorf, a white male, made $21,000.
 
 
 5
 In March of 1976, Wilson requested and received a transfer to a different department within AMC. In September 1983, she left the company. In her Title VII action against AMC, Wilson argued. that that the November 1975 demotion was not justified and was the product of race and sex discrimination. At trial, she presented evidence that the Michigan office workload was unusually heavy and that the office was understaffed. She testified that she was not trained in accord with express AMC policies and that the HUD audit took her away from her regular duties. Moreover, she asserted that she never received any warnings about her performance. AMC officials testified that Wilson was "in over her head" and although she could handle problems as they occurred, she did not develop strategies to anticipate and prevent problems. The company denied discriminatory motives for its decisions.
 
 
 6
 The district court dismissed the suit at the close of Wilson's presentation of evidence. The court made the following findings in its written opinion: that there were legitimate, nondiscriminatory reasons for the differences in salaries; that white males received the same poor training and were subjected to the same type of summary discharges or demotions without warning; that Wilson did not receive disparate treatment in any aspect of employment; and that AMC's actions were not motivated by discriminatory intent.
 
 
 7
 A district court's finding of discriminatory intent in a Title VII case is a finding of fact and is thus subject to the clearly erroneous standard. Anderson v. City of Bessemer City, 105 S.Ct. 1504, 1508 (1985) (citing Pullman-Standard v. Swint, 456 U.S. 273 (1982) ). Thus, we must review the district court's findings of fact in this case to determine whether we find them clearly erroneous, that is, whether we are left with a firm, clear conviction that the district court was wrong. We may not duplicate the process undertaken by the district court in an examination of the evidence de novo. See, e.g., id. at 1511-12. Although we might have decided the matter differently had it come before us de novo, we are unable to conclude from our examination of the record that the trial judge's findings in regard to treatment and intent were clearly erroneous, nor has appellant Wilson demonstrated to us that the trial judge committed any reversible error of law. Accordingly, we affirm the judgment of the district court.
 
 
 8
 Although we affirm the district court in its findings in regard to discriminatory intent and disparate treatment, which are the ultimate conclusions in a Title VII case, we believe the district court's analysis of the prima facie case was not wholly correct. The district court held that the plaintiff did not show a prima facie case as required by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and dismissed the action at the close of the plaintiff's proofs. Under McDonnell Douglas, which set forth the prima facie elements of a discriminatory hiring action, a plaintiff must show:
 
 
 9
 (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applications; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 10
 Id. at 802. The district court adapted the test to require that the plaintiff show she is a member of a protected class, she was demoted without valid cause, and that the employer solicited applications for the vacant position. Our research has yielded no published case from the Supreme Court or a Court of Appeals setting forth the requirements of a prima facie showing in a Title VII suit alleging discriminatory demotion; however, after considering the purpose of the Act and the Supreme Court's discussions of the purpose of the prima facie case, see, e.g., McDonnell Douglas, 411 U.S. 792; Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); Furnco Construction Corp. v. Waters, 438 U .S. 567, 577 (1978), we find that the lower court's standard, as applied, placed too heavy a burden on the plaintiff.
 
 
 11
 In regard to the court's interpretation of the "cause" element in its adapted standard, it appears that the lower court equated the burden in the prima facie case with the ultimate burden. The prima facie requirement that plaintiff show she was demoted without valid cause should not be confused with the ultimate inquiry--whether the defendant intentionally discriminated against the defendant. The prima facie elements are intended only to raise an inference of discrimination. Furnco, 438 U.S. at 577. The core of Wilson's case depended on the causes for the company's actions. To require her to prove in her prima facie case that there was no valid reason whatsoever for her demotion would be to require her to prove her entire case at the first stage.
 
 
 12
 It is not "an onerous task" to establish the prima facie case. Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 95 (6th Cir.1982). It is enough to allege activities which "if otherwise unexplained, are more likely than not based on consideration of impermissible factors." Furnco, 438 U.S. at 577. In a discriminatory demotion setting, a plaintiff has met the burden in the first stage in regard to the element of cause if she demonstrates that (i) she is a member of a protected group; (ii) she was qualified for retention in her existing job; (iii) she was not so retained despite her qualifications; and (iv) the employer solicited a replacement for the vacant position. Cf. Grubb v. Wafoote Memorial Hospital, Inc., 741 F.2d 1486, 1493 (6th Cir.1984) (prima facie case for discriminatory discharge). In Wilson's case, the facts that she had not affirmatively committed any breach of duty or improper act and also had received no warnings about her performance, together with the fact that both Wilson's replacement and subordinate were receiving higher salaries, appear sufficient to raise an inference in the prima facie case that Ms. Wilson was treated discriminatorily in regard to the terms and conditions of her employment. The particular justification that were articulated by AMC in regard to the special circumstances of the company's reorganization are of the type generally considered in the second stage of a Title VII inquiry.[3]
 
 
 13
 This lack of a technically precise analysis under the three-stage shifting of burdens does not require us to reverse the decision, however, as the ultimate conclusion is based on correct principles of law and is not clearly erroneous. The method of analysis set forth in McDonnell Douglas is not a rigid one; the allocation of burdens and order of presentation of proof is meant to be a sensible and orderly way to determine the ultimate question. United States Postal Service Board of Governors v. Aikens, 460 U .S. 711, 715-16 (1983). Thus, although the analysis was flawed, we do not believe that reversal is required.
 
 
 14
 Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 AMC argues that Ms. Wilson continued to receive pay increases, and therefore was not in fact demoted. Wilson responds by pointing out that her responsibilities were reduced and she supervised fewer employees. We note that salary is not necessarily a conclusive or exclusive indicator of demotion. An employer cannot discriminatorily lower an employee's rank, job status and responsibility and then insulate itself from Title VII liability merely be maintaining the same pay level
 
 
 [2]
 Waldorf, brought in for his allegedly superior administrative abilities, was likewise unable to reduce the delinquency rate. He was fired in July 1976
 
 
 [3]
 We feel no need here to describe the three-stage shifting of burdens to be used in Title VII cases. Those requirements are fully set forth in opinions of the Supreme Court and this court. See, e.g., Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); Morvay v. Maghielse Tool & Die Co., 708 F.2d 229 (6th Cir.1983)