*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0092A (6th Cir.)
File Name: 00a0092a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LEIGH CLINE,
    *Plaintiff-Appellant,*

    *v.*

CATHOLIC DIOCESE OF
TOLEDO; CATHOLIC
DIOCESAN SCHOOL OF
TOLEDO; ST. PAUL
ELEMENTARY SCHOOL;
HERBERT J. WILLMAN,
Administrator St. Paul
Elementary School,
    *Defendants-Appellees.*

No. 98-3527



Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 97-07472—James G. Carr, District Judge.

Argued: October 25, 1999

Decided and Filed: March 14, 2000

Before: JONES, MOORE, and GILMAN, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** David W. Leopold, DAVID WOLFE LEOPOLD & ASSOCIATES, Cleveland, Ohio, for Appellant.  Gregory T. Lodge, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Appellees.  **ON BRIEF:**  David W. Leopold, DAVID WOLFE LEOPOLD & ASSOCIATES, Cleveland, Ohio, for Appellant.  Gregory T. Lodge, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Appellees.

—————————————

**AMENDED OPINION**

—————————————

NATHANIEL R. JONES, Circuit Judge.    Plaintiff-Appellant Leigh Cline ("Cline") brought a pregnancy discrimination suit against Defendants-Appellees, Catholic Diocese of Toledo, et al., ("St. Paul"), under Title VII and Chapter 4112 of the Ohio Revised Code.  She also asserted claims for breach of contract and promissory estoppel.  Cline appeals the summary judgment granted by the district court in favor of St. Paul on all four claims.  For the following reasons, we reverse in part and affirm in part.

**I.**

St. Paul Elementary and High School employed Leigh Cline as a teacher from June 1994 until St. Paul decided not to renew her contract after the 1995-1996 year.  St. Paul is a parish of the Roman Catholic Church located within the Catholic Diocese of Toledo.  The defendants-appellees in this case include St. Paul Elementary School, the Catholic Diocese of Toledo, the Catholic Diocesan School of Toledo and Father Herbert J. Willman.    Father Willman is responsible for all religious matters within the parish, including oversight of the parish schools.

After graduating from Bowling Green in 1993, Cline began teaching at St. Paul as an elementary substitute teacher. In June 1994, she was awarded a full-time eighth-grade teaching position for the 1994-1995 school year, assuming religion and math class duties, and also teaching high school math and coaching girls' basketball. After her first year, the school renewed Cline's teaching contract for the 1995-1996 school term and granted her request to teach the second grade. Cline's position as a second-grade teacher involved significant training and ministry in the Catholic faith. She provided daily religious instruction to students, took students to Mass on a regular basis, and prepared her second-grade students for the sacraments of Reconciliation and Holy Communion. Cline acknowledged that her position at St. Paul required her to "build and live Christian community," "integrate learning and faith," and "instill a sense of mission" in her students.

For each of her two years at St. Paul, Cline's employment was governed by the standard St. Paul one-year employment contract (titled the "Teacher-Minister Contract") ("Contract") as well as the "Affirmations for Employment in the Diocese of Toledo" ("the Affirmation"), both of which she signed for each year. In addition to laying out basic terms of salary, duration and other routine aspects of the position, the Contract incorporates the provisions of the Affirmation document as part of its terms and conditions. The Affirmation outlines the ministerial responsibilities of the "teacher/minister," including the following provisions: 1) a statement that the signer "believe[s] that the work of the Catholic Church, [its agencies] and institutions has characteristics that make it different from the work of other agencies and institutions"; 2) a statement that the signer will "work[] diligently to maintain and strengthen the Catholic Church and its members," and that "[b]y word and example, [the signer] will reflect the values of the Catholic Church;" 3) statements that the signer believes in "mutual trust" and "open communication;" and 4) a statement by the signer that she "is more than a professional." J.A. at 96. The Contract also

incorporates the Teacher Handbook, which states that the mission of the school is to "instill in our children the Gospel message of Jesus Christ." J.A. at 277.[1] Neither the Teacher's Handbook nor the Affirmation explicitly states, nor was Leigh Cline ever expressly informed—in writing, orally or otherwise —that premarital sex comprised a violation of the terms of either the Contract or the Affirmation.

In the fall of 1995, Cline and her boyfriend (now husband) Tom Cline met with Fr. Brickner, the associate pastor of St. Paul Church, to discuss their intention to marry. The Clines married at St. Paul in February 1996. In early March, Leigh Cline informed the assistant principal, Stephen Schumm, and other St. Paul teachers that she was pregnant. Around late March or early April, Cline became visibly pregnant and began to wear maternity clothing to school. Based on his observation of Cline's pregnancy, Fr. Willman correctly concluded that she had engaged in premarital sex.[2]

On learning that she had engaged in premarital sex, St. Paul officials did not immediately terminate Cline. Instead, Fr. Willman considered "all options," including immediate termination. Ultimately, according to Fr. Willman, he decided that the most appropriate course of action was to permit Cline to continue teaching for the remainder of the school year, without renewing her contract after the year had finished. On May 3, 1996, Fr. Willman advised Cline in a conference that "under the circumstances," St. Paul "would

---

[1] The Handbook describes the mission statement and broad philosophy of the school, and lays out more specific matters of school policy and administration, including describing teachers' "religious responsibilities" (e.g., teachers are "expected to uphold, by word and example, all truths, values, and teachings of the Roman Catholic church," J.A. at 277), general "staff policies," "staff certification and other requirements," and teacher salary and benefit provisions. J.A. at 277-94.

[2] In her deposition, Cline acknowledged that her pregnancy resulted from sex before her marriage.

question St. Paul's proffered reason for her non-renewal. The law entitles her to make her case before a trier of fact. For these reasons, we **REVERSE** the district court's summary judgment on the discrimination claims and **AFFIRM** on the contract claims.

reasons that Cline is entitled to pursue her federal discrimination claim before a trier of fact, she is equally entitled to press on with her claim under Ohio's Civil Rights Act.

## E.

We agree with the district court that Cline's contract claims are meritless. The contract itself was for a one-year term, to end on June 30, 1996, with no express or implied right to renewal. Its terms were fulfilled. Her promissory estoppel claim also lacks merit. To win under a theory of promissory estoppel, a plaintiff must show "detrimental reliance of the promisee upon the false representations of the promissor." *Karnes v. Doctor's Hosp.*, 51 Ohio St. 3d 139, 142 (1990). Although Cline generally alleged that she was unsuccessful in finding work immediately after she was informed of her non-renewal, she presented no evidence showing that she detrimentally relied on the school's implication that her contract would be renewed, or that she was injured by that reliance. Thus, the district court correctly granted summary judgment for St. Paul on her promissory estoppel claim.

## IV.

When faced with a similar fact situation in *Ganzy*, Judge Weinstein of the Eastern District of New York concluded:

> Plaintiff's evidence . . . might lead a jury to find that the religious reason--premarital sex--for the termination is a pretext. Contrariwise, a jury might well find that [the school's decision was made] because [of] the school's religious beliefs. . . . Or it might simply not believe the Plaintiff's version of the incident. . . . Under such circumstances, a decision by a cross-section of the community in a jury trial is appropriate.

995 F. Supp. at 360-61. The situation in this case is no different. Cline has introduced sufficient evidence to make out a prima facie case, and sufficient evidence to call into

not renew her contract or hire her for the next school year." According to Fr. Willman's deposition, the "circumstances" he was referring to were that "Leigh [] became pregnant before she got married." J.A. at 536. In a formal letter explaining the decision not to renew her contract, sent May 4, Fr. Willman wrote:

> We expect our teachers to be good, strong role models for our children. . . . It is stated in your contract, working agreement that 'by word and example you will reflect the values of the Catholic Church.' . . . [P]arents in the community have serious concerns about a teacher who marries and is expecting a child 5 months after the wedding date. We expect teachers and staff members at St. Paul to observe the 6 month preparation time for marriage. . . . The Church does not uphold sexual intercourse outside of marriage. We consider this a breach of contract/working agreement.

J.A. at 313. Cline continued teaching at St. Paul through the end of the school year. Her child was born on July 10, 1996.

Cline disputes some of St. Paul's evidence about the events preceding her non-renewal. She argues that when Fr. Willman informed Cline of the decision not to renew, he only stated that it was due to her pregnancy so soon after marriage; according to Cline, he did not mention premarital sex. She also presents other evidence contradicting Fr. Willman's assertion that, after discovering her pregnancy, the school decided to retain her only through the remainder of the 1995-1996 school year. In particular, Cline received a glowing Teacher Performance Evaluation on April 19,1996, nearly two months after the school concluded that she had premarital sex. In addition to noting her "successful" performance in almost all of fifteen objective criteria, Principal Schumm praised Cline for "adjust[ing] very well" to the "busy and changing year in regard to [her] classroom reassignment and

personal life." J.A. at 183.[3]  Finally, the evaluation implied that a contract renewal would be forthcoming for the following year, concluding: "Your class of 2nd grade students is well managed and respectful.  I would expect continued growth for the 1996-97 school year." J.A. at 183.

On October 11, 1996, Cline filed a charge of discrimination with the Equal Employment Opportunity Commission.  The EEOC issued a Notice of Right to Sue, and on June 17, 1997, Cline filed her complaint in the district court claiming illegal sex and pregnancy discrimination under Title VII, 42 U.S.C. § 2000e et seq.,  and Chapter 4112 of the Ohio Revised Code.  She also brought claims for breach of contract and promissory estoppel.  On January 30, 1998, defendants filed their Motion for Summary Judgment.  Finding that Cline had failed to make out a prima facie case of discrimination, the court granted summary judgment on April 3, 1998.  This timely appeal followed.

## II.

We review *de novo* a district court's grant of summary judgment, using the same Rule 56(c) standard as the district court. *See Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir. 1996).  Under that standard, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, we assess the factual evidence and draw all reasonable inferences in favor of the non-moving party. *See National Enterprises, Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).  Merely alleging the existence of a factual dispute is insufficient to defeat a

---

[3]Father Willman stated in his deposition that he had read these positive evaluations.

dispute fly in the face of the Supreme Court's warning that the district court must not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson*, 477 U.S. at 249.

Finally, St. Paul's frequent reliance on *Boyd*, which concluded that Boyd's claim did not survive the rebuttal stage, does not help its argument here; indeed, that case bolsters Cline's arguments.  In *Boyd*, this Court did not review an order of summary judgment, but affirmed a bench trial decision.  Its affirmance on the merits therefore provides no support for St. Paul's arguments that Cline is not entitled to a trial at all.  The fact that the parties in this case have waged vigorous factual disputes over the central factors the *Boyd* Court considered in its holding—namely, whether the school applied its standards in a discriminatory manner, and whether the school's policy was based on pregnancy or premarital sex—underscores that in this case there is indeed a genuine dispute over the most important material facts.  This further highlights the district court's error in granting summary judgment.

## D.

We also reverse the district court's decision with respect to the discrimination claim under Ohio law. Ohio courts utilize the same *McDonnell Douglas* analysis described *supra* when analyzing discrimination claims brought under the Ohio Civil Rights Act, Ohio Rev. Code Ann. § 4112. *See Ohio Civil Rights Comm'n v. Ingram*, 630 N.E.2d 669, 672 (Ohio 1994) (holding that federal caselaw interpreting and applying Title VII is generally applicable to cases involving Chapter 4112); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E. 128, 131-32 (Ohio 1981) (applying *McDonnell Douglas*).  This is no different for discrimination claims brought against sectarian schools. *See Basinger v. Pilarczyk*, 707 N.E.2d 1149, 1150-51 (Ohio Ct. App. 1997) (stating that the *McDonnell Douglas* analysis applies when teacher sues a sectarian school).  For the same

fact as to whether St. Paul enforces its policy solely by observing the pregnancy of its female teachers, which would constitute a form of pregnancy discrimination.

No doubt, St. Paul may have sharp retorts to many of Cline's factual claims. Indeed, many of its responses could well convince a trier of fact of its case. But at this stage in the trial, the district court's and our role is not "to weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, but "to determine whether there is a genuine issue for trial." *Id.* To do so, the court must look at the evidence and make all reasonable inferences in the light most favorable to Cline. *See National Enterprises, Inc.*, 114 F.3d at 563. If, in that light, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a trialCand not summary judgmentCis warranted. *Anderson*, 477 U.S. at 248. Observed in a light most favorable to her, Cline has clearly offered evidence sufficient to leap this hurdle.

The district court's contrary conclusion reflects an errant approach to the summary judgment stage. At each step of its analysis, rather than drawing inferences in Cline's favor, the court credited St. Paul's account over Cline's. For instance, the court rebuts Cline's statements that conversations with Fr. Willman centered on her pregnancy by finding that Fr. Willman "has explained that plaintiff's pregnancy was significant only because it accurately demonstrated her decision to have premarital sex." J.A. at 338. This disagreement is a crucial dispute over a key material fact; rather than reserving it for the trier of fact to resolve, the court has favored the school's explanation. St. Paul asks us to do the same throughout its brief.[9] This and other examples of crediting St. Paul's factual contentions amid a genuine factual

---

[9]On a number of occasions, St. Paul simply favors Fr. Willman's testimony over Cline's. *See, e.g.*, St. Paul's Br. at 19-24. But this we cannot do on summary judgment.

summary judgment motion; rather, there must exist in the record a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).

### III.

### A.

Title VII's prohibition on employment practices that discriminate "because of [an] individual's sex," 42 U.S.C. § 2000e-2(a)(1), applies with all its force to employers who discriminate on the basis of pregnancy. *See* 42 U.S.C. § 2000e(k);[4] *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 89-90 (1983); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983); *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) ("Congress manifested its belief that discrimination based on pregnancy constitutes discrimination based on sex."). Thus, a claim of discrimination on the basis of pregnancy "must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *Boyd*, 88 F.3d at 413. Such a claim requires that the plaintiff first establish a prima facie case of unlawful discrimination by showing that 1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision. *See id*. In a termination case such as this one, a plaintiff meets the second prong by showing that she was performing "at a level which met [her] employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its actions. *Boyd*, 88 F.3d at 413 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 238, 253

---

[4]According to Section 2000e(k), the term "because of sex" means, among other things, "on the basis of pregnancy, childbirth, or related medical condition." 42 U.S.C. § 2000e(k).

(1981)).  If the defendant fails to satisfy this burden, plaintiff prevails.   If the defendant satisfies this burden, then the presumption of intentional discrimination is negated; the employee must then prove by a preponderance of the evidence that the defendant intentionally discriminated against her. She may do this by showing that the "nondiscriminatory" reasons the employer offered were not credible, but were merely a pretext for intentional discrimination.  *See id.*; *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (stating that the factfinder's "disbelief of the reasons put forward by the defendant" may, "together with the elements of the prima facie case, suffice to show intentional discrimination").

The Congressional drafters of the 1964 Civil Rights Act recognized the sensitivity surrounding the status of religious groups and institutions.   Thus, while Title VII exempts religious organizations for "discrimination based on religion," it does not exempt them "with respect to all discrimination . . . . [] Title VII still applies . . . to a religious institution charged with sex discrimination." *Boyd*, 88 F.3d at 413; *see also Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985) ("Title VII does not confer upon religious organizations a license to make [hiring decisions] on the basis of race, sex, or national origin."). Because discrimination based on pregnancy is a clear form of discrimination based on sex, religious schools cannot discriminate based on pregnancy.  *See Boyd*, 88 F.3d at 413-14; *Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 349 (E.D.N.Y. 1998) (stating that restrictions on pregnancy "are not permitted because they are gender discriminatory by definition"); *Dolter v. Wahlert High Sch.*, 483 F. Supp. 266, 270 (N.D. Iowa 1980) (stating that a school has violated Title VII if it terminates a plaintiff for pregnancy alone). In suits like Cline's, courts have made clear that if the school's purported "discrimination" is based on a policy of preventing nonmarital sexual activity which emanates from the religious and moral precepts of the school, and if that policy is applied equally to its male and female employees, then the school has

those relations are revealed through pregnancy.  *See also Vigars v. Valley Christian Ctr.*, 805 F. Supp. 802, 808 (N.D. Cal. 1992) (stating that an anti-premarital sex policy violates Title VII if it is enforced solely through observing pregnancy, because such a policy subjects "only women" to termination "for something that men would not be, and that is sex discrimination, regardless of the justification put forth for the disparity").   In other words, a school can not use the mere observation or knowledge of pregnancy as its sole method of detecting violations of its premarital sex policy.

In assessing Cline's attempts to show pretext, the district court far too hastily sided with St. Paul.  Factually, this case is a tightly-waged battle.   Cline presented a variety of concrete evidence casting into doubt the "reason" St. Paul profferedCthat it decided not to renew her contract because she had violated its blanket policy against premarital sexCand raising an issue of fact as to whether the treatment was due to her pregnancy. Most importantly, she presented evidence that the school continued to view her as sufficiently qualified to teach: the complimentary evaluation (mentioning both her "personal" and "professional" life), its consideration of other "options" for some time before opting to terminate her, and Father Willman's suggestion in the record that "things might have worked out differently" had Cline notified him of her pregnancy sooner. She also produced some evidence showing that the school may have focused more on the fact of her pregnancy than her sexual activity. For instance, she testified to conversations and produced statements in which school officials explicitly discussed her "pregnancy" rather than her sexual actions.  Finally, Cline adduced evidence that the policy was not applied equally among men and women. St. Paul officials acknowledged in their depositions that Cline's pregnancy alone had signaled them that she engaged in premarital sex, and that the school does not otherwise inquire as to whether male teachers engage in premarital sex. At oral argument, counsel for St. Paul conceded that it was only Cline's pregnancy that made it evident that she had engaged in premarital sex. These admissions raise an issue of material

*Ganzy*, 995 F. Supp. at 359 (stating that the defendant-school "discharge[d]" its burden of production when it "stated that Ganzy violated its religious teachings by engaging in premarital sexual activity"). As in those cases, St. Paul has "simply explain[ed] what [it] has done [and] produce[d] evidence of legitimate nondiscriminatory reasons." *Burdine*, 450 U.S. at 256.

*(b)  Showing of Pretext.*

The presumption of discrimination having been rebutted, "the factual inquiry proceeds to a new level of specificity," with Cline shouldering the burden of "demonstrat[ing] that the proffered reason was not the true reason for the employment decision." *Burdine*, 450 U.S. at 255-56. This burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* Once again, therefore, Cline must answer the ultimate question: did St. Paul discriminate against her "because she was pregnant," or "for engaging in sex outside of marriage" in violation of the school's moral code? *Boyd*, 88 F.3d at 414; *see also Ganzy*, 995 F. Supp. at 349; *Dolter*, 483 F. Supp. at 270.

Because Cline enjoys a "full and fair opportunity" to make this showing, *Burdine*, 450 U.S. at 256, she can pursue several avenues of discovery. First, she can show intentional discrimination directly by showing "that a discriminatory reason more likely motivated the employer" than the reason the employer proffered. *Id.* at 256. Second, she can indirectly show "pretext" by showing "that the employer's proffered explanation is unworthy of credence." *Id.* In the pregnancy discrimination context in particular, Cline also may show that St. Paul enforced its premarital sex policy in a discriminatory mannerCagainst only pregnant women, or against only women. *See Boyd*, 88 F.3d at 414. This is because a school violates Title VII if, due purely to the fact that "[w]omen can become pregnant [and] [m]en cannot," *Ganzy*, 995 F. Supp. at 344, it punishes only women for sexual relations because

not discriminated based on pregnancy in violation of Title VII. *See Boyd*, 88 F.3d at 414-15; *Ganzy*, 995 F. Supp. at 344; *Dolter*, 483 F. Supp. at 270.

The central question in this case, therefore, is whether St. Paul's nonrenewal of Cline's contract constituted discrimination based on her pregnancy as opposed to a gender-neutral enforcement of the school's premarital sex policy. While the former violates Title VII, the latter does not. This is primarily a factual battle, to be resolved on summary judgment only if Cline presented insufficient evidence to create a genuine dispute over the material facts. Because we find that Cline put forth sufficient evidence to create such a dispute, we hold that summary judgment was inappropriate.

**B.**

The district court granted St. Paul's motion for summary judgment, agreeing with the school's arguments on all four of Cline's claims.

First, the court found that Cline failed to make a prima facie case of discrimination under *McDonnell Douglas* because she did not satisfy the second prong required: showing she was qualified for the job.[5] By engaging in premarital sex, she had violated both the Contract and Affirmation, and her promise under them "to live according to the principles of the Catholic Church." J.A. at 332. Her own actions therefore rendered her unqualified for the teaching position. In making this conclusion, the district court reasoned that cases like *Dolter*, which rejected motions for summary judgment for similar pregnancy discrimination claims, were distinguishable because Cline had offered no proof that the premarital sex policy applied differently to men and women. In *Dolter*, such a showing was made.

---

[5] The district court stated that the first, third, and fourth prongs were satisfied. This is undisputed by St. Paul.

The district court next reasoned that even if Cline had made out a prima facie case, she had still failed to show that St. Paul's "nondiscriminatory" reason for the non-renewal was a mere pretext for pregnancy discrimination. In concluding so, the court parsed through the evidence of Fr. Willman's statements, finding that they demonstrated that "it was [not] pregnancy [] that motivated the termination," but the fact of premarital sex. J.A. at 338. The court distinguished the *Ganzy* case – where the district court refused to grant a motion of summary judgment for similar circumstances – by the fact that Ganzy had been able to show more decisively that the discrimination was rooted in her pregnancy.

The court also set aside Cline's breach of contract and promissory estoppel claims. The contract claim failed because the contract was "fully performed," J.A. at 341, while the promissory estoppel claim failed because Cline did not show any detrimental reliance.

## C.

Looking anew at the record, we conclude that the district court fundamentally misapplied the *McDonnell Douglas* test. Before we explain the nature of the court's errors, we recite the "first principles" of *McDonnell Douglas*'s burden-shifting regime. The three-part inquiry provides "an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *Hicks*, 509 U.S. at 506; *see Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988) (stating that the *McDonnell Douglas* regime is "meant only to aid courts and litigants in arranging the presentation of evidence").[6] The framework is designed

---

[6] The Supreme Court has recognized that "as a practical matter," the "real-life sequence of a trial" does not necessarily comport with this model. *Hicks*, 509 U.S. at 510 n.3. Indeed, it acknowledged that to avoid summary judgment, "the defendant feels the 'burden' not when the plaintiff's prima facie case is proved, but as soon as evidence of it is introduced." *Id.* In his dissent in *Hicks*, Justice Souter also discussed the

## 2. Production and Rebuttal

Because Cline has successfully made a prima facie showing, we next must consider the rebuttal phase: did St. Paul satisfy its burden of producing a nondiscriminatory reason for the non-renewal, and can Cline meet her burden of establishing that this reason was a mere pretext? The district court concluded that St. Paul satisfied its burden of articulating a nondiscriminatory reason. It also concluded that Cline did not demonstrate the existence of a genuine issue of material fact as to whether that reason was pretextual. While we agree with the first conclusion, we disagree with the second.

### (a) Burden of Production

First, we agree with the district court that St. Paul successfully articulated a nondiscriminatory reason for its actions. The burden on St. Paul "is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254. This is a burden of production; although "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons," it must raise "a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* To do this, "the defendant must clearly set forth . . . the reasons for the plaintiff's rejection," and that explanation "must be legally sufficient to justify a judgment for the defendant." *Id.* at 255.

St. Paul satisfied this burden by asserting that it did not renew Cline's contract because she violated her clear duties as a teacher by engaging in premarital sex. This conclusion squares with *Boyd* and *Ganzy*, where schools articulated similar reasons as their motivation for termination. *See Boyd*, 88 F.3d at 414 (agreeing with the district court's conclusion that the defendant "articulated a legitimate, nondiscriminatory reason by stating that it fired plaintiff Boyd not because she was pregnant, but for engaging in sex outside of marriage");

regarding the employer's true motives for making the challenged employment decision." *Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir. 1998). Requiring a rebuttal by the defendant "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-56. Without a clearly articulated reason,

> the plaintiff does not know whether the employment decision was made upon his work record or upon an illegitimate racial preference. His offer of proof is somewhat thwarted by this confusion. *A plaintiff cannot disprove as a cause for his failure to be rehired a source of dissatisfaction of which he is unaware*.

*Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 97 (6th Cir. 1982) (emphasis added). Thus, a court distorts the *McDonnell Douglas* framework by requiring a plaintiff to show that the reason for which she was terminated is nondiscriminatory before even requiring the defendant to articulate that reason. This is precisely what the district court did in this case.

Without considering the "ultimate question" of whether St. Paul's premarital sex policy was applied in a discriminatory way, or whether it was the true reason the school terminated Cline, there is little doubt that Cline made a prima facie case showing that she was meeting St. Paul's legitimate expectations. "In order to show that [s]he was qualified, [the plaintiff] must prove that [s]he was performing . . . 'at a level which met [her] employer's legitimate expectations.'" *McDonald*, 898 F.2d at 1160 (citation omitted). The evidence Cline presented of her two-year record of success, and in particular her positive April 1996 evaluation, is more than enough to meet this standard. The fact that the school allowed her to keep teaching for the remainder of the year further bolsters this showing. She thus successfully made out a prima facie case.

to sharpen the inquiry to a "level of specificity" which best allows the fact-finder to resolve the "ultimate question": whether the plaintiff established by a preponderance of the evidence that the defendant intentionally discriminated against her. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination."); *Kent County Sheriff's Ass'n v. County of Kent*, 826 F.2d 1485, 1493 (6th Cir. 1987). While the discrete stages are meant to facilitate litigants and courts in reaching and resolving that ultimate question of discrimination, when misapplied, they tend to distract courts from the central issue. This is precisely what happened below.

### 1. The Prima Facie Case

First, the district court improperly rejected Cline's prima facie case. In fact, the court's analysis of the second prong improperly precluded Cline from being able to challenge the policy she claims to be discriminatory. This contravenes the very purpose for the prima facie stage set out in *McDonnell Douglas* and *Burdine*.

---

practical realities of pre-trial and trial structure. "The [*McDonnell Douglas*] analysis of burdens describes who wins on various combinations of evidence and proof. It may or may not also describe the actual sequence of events at trial. In a bench trial, for example, the parties may be limited in their presentation of evidence until the court has decided whether the plaintiff has made his prima facie showing. But the court also may allow in all the evidence at once." *Id.* at 533 n.9 (Souter, J., dissenting). Nonetheless, the Supreme Court has continued to insist that courts examine evidence as if it is introduced through the three-part sequence described in *McDonnell Douglas*, although a district court will be aware of a defendant's nondiscriminatory reason before moving beyond plaintiff's prima facie stage.

The prima facie requirement for making a Title VII claim "is not onerous," *Burdine*, 450 U.S. at 253, and poses "a burden easily met." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). The prima facie phase "merely serves to raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'" *Hollins v. Atlantic Co.*, 188 F.3d 652, 659 (6th Cir. 1999)(quoting *Burdine,* 450 U.S. at 253-54). It is "only the first stage of proof in a Title VII case," and its purpose is simply to "force [a] defendant to proceed with its case." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861-62 (6th Cir. 1997). This division of intermediate evidentiary burdens is not meant to stymie plaintiffs, but simply serves to "bring the litigants and the court expeditiously and fairly to the ultimate question." *Burdine*, 450 U.S. at 253.

The district court ignored these precepts when it held that Cline failed to make a prima facie showing. In addition to setting a burden far too high, it conflated the distinct stages of the *McDonnell Douglas* inquiry by using St. Paul's "nondiscriminatory reason" as a predicate for finding Cline to have failed to make a prima facie case. The court found Cline "unqualified" under prong two of the prima facie case because she had not lived up to the promises she made to "exemplify the moral values taught by the Church." J.A. at 332. Because her pregnancy due to premarital sex meant that "she no longer met all the qualifications of her position," even strong evidence as to her satisfactory performance (*ie.*, her evaluations and teaching record) could not overcome these moral failings. J.A. at 333. This analysis improperly imported the later stages of the *McDonnell Douglas* inquiry into the initial prima facie stage. As discussed *infra*, St. Paul alleges that it did not renew Cline's contract because she violated its premarital sex policy, which constituted part of the broader ministerial requirements of being a St. Paul teacher; conversely, Cline argues that this rebuttal is a pretext for discrimination. Rather than resolve this debate at the prima facie stage, *McDonnell Douglas* requires that the

Under *Aikens*, *Hicks* and this Court's caselaw applying those decisions, Cline is thus correct when she argues that the district court wrongly assessed whether she made a sufficient prima facie showing. The district court compounded this error when it stated that a plaintiff in Cline's position could show she was qualified if she "were able to demonstrate some basis for a finding that the job qualifications" were discriminatory. J.A. at 335. In other words, the court would require plaintiffs to show in their prima facie case that the reason for which their employer terminated them is itself discriminatory. This is errant for two related reasons. First, once a defendant has articulated and proffered evidence that it terminated a plaintiff because she failed to meet certain expectations, it has by definition already taken the inquiry beyond the prima facie stage with respect to that reason. While the plaintiff must still show that she met her employer's legitimate expectations to get beyond the prima facie stage, her attempts to rebut the defendant's reason comprise part of the ultimate factual questionCthe third stage of *McDonnell Douglas*. Of course, if she fails to rebut the defendant's nondiscriminatory reason, she loses the suit on that ground—but it is technically incorrect to rule that she failed at the prima facie stage. Second, forcing plaintiffs to make such a proof at the prima facie stage defies the very purpose of the production stage and the overall sequence of *McDonnell Douglas*. The burden-shifting analysis of *McDonnell Douglas* exists, in part, to resolve "the disparity in access to information between employee and employer

49; *McDonald*, 898 F.2d at 1162. Failure at the latter stage is precisely the result this holding would mandate. This point should alleviate St. Paul's underlying concern, exemplified by its driver's license hypothetical, that this decision will allow meritless discrimination suits to clog the federal docket. This is not the case. The approach set forth in this opinion will dispose of meritless cases as expeditiously as the approach undertaken by the district court. Plaintiffs who lack evidence undermining the reason articulated for their termination will falter on summary judgment after a set amount of discovery—just as before, and just as in *Ang* and *McDonald*.

precedent dictate that the district court reserve for the rebuttal stage its assessment of the justification St. Paul "produced" to explain its decision not to renew Cline. Here, the court has improperly applied that justification to defeat Cline at the prima facie stage.[8]

---

[8] St. Paul argues in its petition for rehearing that our decision "conflicts with a well-established line of Sixth Circuit precedent." St. Paul's Pet. at 2. We disagree.

This opinion in fact adheres to the fundamental rule of law emerging from the cases which St. Paul puts forth: that a plaintiff must show that she was meeting her employer's legitimate expectations and was performing to her employer's satisfaction. *See, e.g.*, *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 729 (6th Cir. 1999); *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991); *McDonald*, 898 F.2d at 1160. It also adheres to the long line of cases properly applying the rule from *Aikens*. *See, e.g.*, *Avery Dennison Corp.*, 104 F.3d at 860; *Brownlow*, 867 F.2d at 963; *Fields v. Bolger*, 723 F.2d 1216, 1219 (6th Cir. 1984).

We also do not believe that this opinion varies from any firm or uniformly applied legal principle guiding the determination of whether a plaintiff has met her employer's expectations. Indeed, due in part to the variety of factual situations that arise in discrimination cases, circuit panels appear to have utilized approaches which are at odds. *Compare, e.g.*, *Ang*, 932 F.3d at 548-49; and *McDonald*, 898 F.2d at 1159-60, *with Barnett*, 153 F.3d at 341 (treating failure to pass a basic test as the legitimate, nondiscriminatory reason for plaintiff's termination, rather than a factor making her unqualified); *Danielson*, 938 F.2d at 683 (treating "poor work performance" as the legitimate, nondiscriminatory reason, and not as a prima facie factor); and *Mills*, 800 F.2d at 638-39 (considering unsatisfactory ratings as defendant's "production," and not at prima facie stage). This opinion is thus an effort to add clarity and consistency to what has been an inconsistent approach to assessing the legitimate expectations standard. It does so by faithfully applying the logic from cases that preceded the divergence in those approaches, in addition to clear and binding Supreme Court caselaw.

Finally, not only does this case adhere to the underlying legal standard espoused in cases such as *Ang* and *McDonald*, but the more fine-tuned approach we have put forth would change neither the outcome nor the economy of such cases. Plaintiffs in those cases lost at both the first and third stages of *McDonnell Douglas* inquiry. *See Ang*, 932 F.2d 548-

---

district court consider this dispute at the inquiry's third stage, when its role is to decide the "ultimate question" of discrimination. In other words, when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff. The district court clearly failed to do this, improperly conflating the distinct stages of the *McDonnell Douglas* inquiry.

While St. Paul argued in its petition for rehearing that this requirement defies Circuit law, we believe that this approach not only comports with circuit caselaw, but is the only one that remains faithful to the purpose and structure of *McDonnell Douglas*. *Aikens* best illuminates this point. *Aikens* reminds us that once a defendant "responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection," whether or not the plaintiff made out a prima facie case "is no longer relevant." 460 U.S. at 714; *see Avery Dennison*, 104 F.3d at 860-63. Rather, by producing evidence of its nondiscriminatory reason, a defendant has moved the inquiry to the ultimate factual question of whether its action against the plaintiff was discriminatory or not, and plaintiff thereafter enjoys the opportunity to rebut that reason and show discrimination. At this point, a district court cannot resolve the case by returning to the prima facie stage. *See Aikens*, 460 U.S. at 717; *Avery Dennison*, 104 F.3d at 862-63. To do so would mistakenly "apply[] legal rules which were devised to govern 'the basic allocation of burdens and order of presentation of proof' in deciding this ultimate question." *Aikens*, 460 U.S. at 716 (quoting *Burdine*, 450 U.S. at 252). This circuit has long recognized the importance of *Aikens* in structuring appellate and district court review of discrimination decisions. *See, e.g.*, *Avery Dennison Corp.*, 104 F.3d at 860; *Brownlow v. Edgecomb Metals Co.*, 867 F.2d 960, 963 (6th Cir. 1989); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 942 (6th Cir. 1987); *Fields v. Bolger*, 723 F.2d 1216, 1219 (6th Cir. 1984).

This case simply requires that the rule from *Aikens* be applied in the pre-trial context. On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry. The court first determines if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the prima facie requirements, including whether she has met the legitimate expectations of her employer. It performs the same function with respect to defendant's production of evidence, and again for the plaintiff's response to that production. For the same reason that it is inappropriate under *Aikens* for the district court to revisit the prima facie stage using defendant's evidence of its nondiscriminatory reason, it is equally inappropriate for the district court in the pre-trial stage to rely on the nondiscriminatory reason for termination to find plaintiff's prima facie case inadequate. This is true even if that "production" evidence happens to show that, in the employer's view, the plaintiff was not meeting its legitimate expectations for the position at issue. *Aikens* instead mandates that at least with respect to the employer's proffered nondiscriminatory reason, the prima facie case is no longer relevant—it has "dropped out" of the inquiry. The plaintiff thus enjoys the full opportunity to show that reason to be pretextual as part of the third stage of *McDonnell Douglas*. While a plaintiff may very well lose on summary judgment because she fails to proffer evidence on that "ultimate issue," a court misapplies the structure of *McDonnell Douglas* by holding that she fails at the prima facie stage due to defendant's nondiscriminatory reason.

We need look no further than some of the most important Supreme Court cases in this area Cscrutinizing not only what the Court said, but the trials which it reviewedCto see that this position is the only logical application of the *McDonnell Douglas* test. In *Aikens*, the district court noted Aikens's general qualifications and positive employer reviews to conclude initially that Aikens had made out a prima facie case. *See* 460 U.S. at 713 n.2 & 714 n.4. At trial, the defense

for plaintiff's termination, rather than a factor making her unqualified); *Danielson v. City of Lorain*, 938 F.2d 681, 683 (6th Cir. 1991) (treating "poor work performance" as the legitimate, nondiscriminatory reason, and not as a prima facie factor); *Mills v. Ford Motor Co.*, 800 F.2d 635, 638-39 (6th Cir. 1986) (considering unsatisfactory ratings as defendant's "production," and not at prima facie stage); *McRory v. Kraft Food Ingredients*, 98 F.3d 1342, 1996 WL 571146 at *4 (6th Cir. 1996) (unpublished) (looking only at a plaintiff's successful work record *prior* to the onset of poor work performance to find the prima facie stage satisfied, worried that otherwise, "most plaintiffs in discrimination cases will be barred from pursuing their claims before ever getting to the employer's conduct"); *Thompson v. Union Carbide Corp.*, 815 F.2d 706, 1987 WL 36807, at *3-*4 (6th Cir. 1987) (unpublished) (affirming decision by district court to move to the "ultimate issue" once defendant offered evidence of reasons for termination, rather than scrutinizing the prima facie stage); *Wilson v. Advance Mortgage Corp.*, 798 F.2d 1417, 1986 WL 17234 at *3 (6th Cir. 1986) (unpublished)(castigating a district court's prima facie requirement that a plaintiff rebut the "causes" for her demotion as invalid because it required her "to prove her entire case at the first stage" and because the company's justifications "are of the type generally considered in the second stage of the Title VII inquiry").

Unsurprisingly, precedent within the pregnancy discrimination context also stands against St. Paul. Consistent with the analysis above, the legal battles in cases like this have largely been waged at the rebuttal phase, not the prima facie phase. In *Boyd*, the teacher's qualification for the job was simply not a contested issue even though she violated the school's extramarital sex policy. *See* 88 F.3d at 413. In *Ganzy*, the district court held plainly that the plaintiff was "qualified for the position she held and was satisfactorily performing her job" even though she had engaged in premarital sex in violation of the school's religious principles. *Ganzy*, 995 F. Supp. at 359. In sum, both logic and

Finally, Circuit caselaw has long recognized the logic of *Aikens*, utilizing the careful analysis we articulate in this case rather than conflating the distinct stages of *McDonnell Douglas*. *See, e.g.*, *Barnett v. Department of Veterans Affairs*, 153 F.3d 338, 341-42 (6th Cir. 1998) (treating failure to pass a basic test as the legitimate, nondiscriminatory reason

---

rebutting plaintiff's prima facie case belong in the later stages of *McDonnell Douglas*, and relying on plaintiff's evidence alone to find the prima facie case satisfied); *Yarborough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir. 1986) (stating that defendant's argument that plaintiff refused a job assignment and thus failed to meet its legitimate expectations was not "appropriately brought as a challenge to the sufficiency of [the] *prima facie* case," and considering only plaintiff's testimony to find a prima facie case to be made); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994)(disapproving of district court's prima facie analysis because it "required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment actionCin other words, to prove pretext and the ultimate issue of intentional discrimination"); *Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir. 1981) (considering a defendant's evidence of unsatisfactory job performance as its production, and not at the prima facie stage); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1510 (10th Cir. 1997) (troubled that "[i]f at the *prima facie* stage the factfinder credits the reasons offered by the defendant for the failure to be promoted, the jury is not required to even consider the plaintiff's evidence on the critical issue of pretext"); *id.* ("[R]elying on a defendant's reasons for the adverse action as a basis for ruling against a plaintiff at the prima facie stage raises serious problems under the *McDonnell Douglas* framework . . . ."); *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1469-70 (10th Cir. 1992)(stating that district court's ruling that the plaintiffs do not establish a prima facie case based on the employer's reasons for their discharge raises "serious problems under the *McDonnell Douglas* analysis" and "short-circuit[s] the analysis at the *prima facie* stage" before allowing plaintiff to show that proffered reason to be pretextual); *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987) (stating that "any disagreement between parties regarding whether a particular plaintiff was adequately performing his job" belongs at the later stages of *McDonnell Douglas*) (11th Cir. 1987); *Paquin v. Federal Nat'l Mortgage Ass'n*, 119 F.3d 23, 27 (D.C. Cir. 1997) (looking at plaintiff's evidence, including her "twenty year tenure" and "series of promotions," *prior* to negative performance evaluations proffered by defendant to find plaintiff to surpass the prima facie stage).

argued that Aikens had not been promoted because he failed to accept several lateral transfers which would have broadened his Postal Service experience. *See id.* at 715. Ultimately, the district court ruled against Aikens for having failed to make out his prima facie case, *see id.* at 716, finding him unqualified due to the Postal Service's explanation. *See Aikens v. United States Postal Serv. Bd. of Governors*, 642 F.2d 514, 518 (D.C. Cir. 1980). While the D.C. Circuit found this reliance on the Postal Service's evidence unconvincing as a matter of fact, *see id.* at 518, the Supreme Court made clear that both courts' analyses were more deeply flawed because they used the defendant's nondiscriminatory reason to assess whether the plaintiff met his prima facie case. Given defendant's production, the court was "in a position to decide the ultimate factual issue in the case," and should have done so. 460 U.S. at 715. The Supreme Court remanded the case to the district court, adding: "Of course, the plaintiff must have an adequate 'opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.'" *Id.* at 716 n.5 (quoting *Burdine*, 450 U.S. at 256).

Except for the fact that Cline's suit was decided at the pre-trial stage, the district court's error in *Aikens*—relying on the nondiscriminatory reason produced by the Postal Board to rule against Aikens at the prima facie stage—is identical to the district court's in this case. Indeed, just as St. Paul's argument here, the defendant's argument in *Aikens* was essentially that Aikens was not qualified, yet the Supreme Court reprimanded the district court for considering that argument as bearing on the prima facie proof. Defendant's argument should instead have been treated as its production of a nondiscriminatory reason, enabling the fact-finder to proceed to the ultimate question of whether the defendant intentionally discriminated against the plaintiff. *See id.* at 715. To assess this evidence at the prima facie stage is to misapply legal rules governing the allocation of burdens and order of proof to the determination of "the ultimate question." *Id.* at 716.

The *Hicks* decision confirms the logic of *Aikens* and applies it to the termination context. In that case, after a number of years of successful employment which included a promotion, St. Mary's fired Hicks following a series of disciplinary actions and a demotion. *See* 509 U.S. at 504-05. The district court nevertheless found him "qualified" for prima facie purposes by looking only at the evidence of Hicks's employment record *prior to* the events that spurred his demotion and consequent termination. *See Hicks v. St. Mary's Honor Ctr.*, 756 F.Supp. 1244, 1249 (E.D. Mo. 1991). In other words, the court did not consider Hicks's alleged violation of various rules as part of the prima facie case (even though they arguably showed that he was not "qualified," just as Cline's violation of an essential rule allegedly deemed her "unqualified" in St. Paul's eyes), but properly reserved its consideration of those alleged violations until the production stage. At that point, the *Hicks* Court emphasized, the prima facie inquiry "drops from the case" and the plaintiff once again has the "full and fair opportunity to demonstrate" that he has been the victim of intentional discrimination. 509 U.S. at 507. Although the Court reversed the court of appeals on the question of whether Hicks met that ultimate burden, the structure of the *Hicks* trial reflects the logic of *Aikens* in the termination context: that whether or not a plaintiff makes a prima facie case must be ascertained by weighing the plaintiff's evidence that she was meeting her employer's legitimate expectations, not by considering the nondiscriminatory reasons produced by the defendant as its reason for terminating her. Moreover, the *Hicks* trial shows that in the termination context, this determination will often involve assessing whether the plaintiff was meeting the employer's expectations *prior to* the onset of the events that the employer cites as its reason for the termination, because weighing the litigants' evidence on the veracity and propriety

of that nondiscriminatory explanation comprises the "ultimate issue" of the case.[7]

---

[7] The *Hicks* trial in particular displays how best to assess the hypothetical posed by St. Paul in its petition for rehearing: that of the truck driver who has lost her license. Clearly, St. Paul argues, such a driver should automatically lose under the "legitimate expectations" prong of the prima facie case. Despite the surface-level appeal of this hypothetical, we believe *Hicks* requires more than a summary conclusion that an employee was unqualified for the reason offered by a defendant, no matter how purportedly objective and neutral that reason might seem. Rather, as in *Hicks*, we should look instead at whether an employee met her employer's legitimate expectations prior to the event(s) that sparked the termination, even if the event is as seemingly objective as losing one's license or violating clear rules, as in *Hicks*. Whether she makes her prima facie case depends on whether she can make this showing.

Meanwhile, as in *Hicks*, the reason proffered by defendant for its termination of a driver (ie., that she lost her license) would by definition constitute the defendant's "production," which entitles plaintiff the opportunity for a full evidentiary rebuttal of that articulated reason. Regarding that issue, a court will thus have reached the ultimate factual question: did her employer fire her because she lost her license, or due to her gender? Perhaps the plaintiff can now put forth evidence that the license justification was merely a pretext for discrimination; for example, perhaps her employer had only suspended men who lost their licenses until they received new licenses; or perhaps she never had a license and always received positive evaluations anyway, but once she became pregnant, she was fired for not having her license. On the other hand, if the company uniformly fires all its employees the moment they lose their licenses, she will likely have no evidence to show discrimination, and will therefore lose on summary judgment. But again, because her lack of a license comprises defendant's nondiscriminatory reason for firing her, she can not lose at the prima facie stage on that ground, even though she would lose on summary judgment anyway barring evidence showing discrimination.

Panels from most other circuits have recognized this insight, and have distinguished between the prima facie and later stages of *McDonnell Douglas* accordingly. *See, e.g.*, *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335-36 (1st Cir. 1988)(looking only at plaintiff's evidence that he was qualified for prima facie purposes, and considering defendant's evidence to the contrary at the rebuttal stage); *Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 54 (3d Cir. 1990) (stating that defendant's arguments